# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

*In re* Flint Water Cases.

Judith E. Levy
United States District Judge

————————————————/

This Order Relates To:

Walters v. Flint
Case No. 17-10164

Sirls v. Michigan
Case No. 17-10342

————————————————/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED MASTER COMPLAINT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' AMENDED SHORT-FORM COMPLAINTS

These cases are two of many cases that are collectively referred to as the Flint Water Cases. They involve a series of individual plaintiffs and they are before the Court on plaintiffs' motion for leave to amend the master complaint and defendants' motions to dismiss. Defendants, a combination of private and public individuals and entities, allegedly set in motion a chain of events that led to bacteria and lead leaching into the

City of Flint's drinking water. Plaintiffs claim that defendants subsequently concealed, ignored, or downplayed the risks that arose from their conduct, causing serious harm in the process. They contend that the effects of what has since been called the Flint Water Crisis are still with them and continue to cause them problems.

The Court has previously adjudicated other motions to dismiss in the Flint Water Cases. First, there was *Guertin v. Michigan*, No. 16-12412, involving an individual plaintiff and many of the same claims and defendants involved in the present cases. Next, there was *Carthan v. Snyder*, No. 16-cv-10444, a consolidated class action that also involved similar defendants and claims.

The present cases involve the same underlying facts as *Guertin* and *Carthan*, and an almost identical set of claims and defendants. Accordingly, this opinion will rely on the Court's earlier rulings to resolve the current motions as efficiently as possible. It will describe plaintiffs' legal claims, how *Carthan* addressed comparable claims, and then explain why a similar or different result is justified based on the factual allegations pleaded here. Relying on this approach, and for the reasons set forth below, the Court will grant in part and deny in part plaintiffs'

motion for leave to amend, and grant in part and deny in part defendants'
motions to dismiss the complaints.

## I.  Procedural History

Plaintiffs originally filed these lawsuits in early 2017. At that time,
they were two of many cases relating to the Flint Water Crisis. As the
number of lawsuits grew, the Court appointed co-liaison lead counsel to
coordinate between the various individual lawsuits. It also directed co-
liaison lead counsel to file a master complaint that would apply to all
pending and future non-class action cases.[1] The attorneys from each
individual case were ordered to file a short-form complaint, adopting
pertinent allegations from the master complaint as they saw fit. The
intent was that this would allow the Court to issue opinions that would
apply to multiple individual cases, rather than to address each case in
turn and cause a delay in the administration of justice.

Counsel for the plaintiffs in these cases were selected as co-liaison
lead counsel. On December 15, 2017, they filed the master complaint in

---

[1] The Court put in place a similar process to manage the class-action side of
the Flint Water Cases. In *Carthan v. Snyder*, it recently granted in part and denied
in part the defendants' motions to dismiss. No. 16-10444, 2019 U.S. Dist. LEXIS
55607 (E.D. Mich. Apr. 1, 2019).

the docket corresponding to *Walters v. Flint*, No. 17-cv-10164. They then filed their short-form complaint in these cases a month later.[2] Soon after, defendants moved to dismiss both complaints. And on September 26, 2018, the Court heard oral argument on the motions. But before the Court could issue a decision, co-liaison lead counsel requested permission to file a motion for leave to file an amended master complaint. The Court instructed them to do so by November 28, 2018, if at all, and they did so. Subsequently, they filed a proposed amended short-form complaint in these cases, incorporating allegations from the proposed amended master complaint.

Since the motions to dismiss were still pending, the Court instructed defendants to brief the motion to amend as if the Court had already granted it and defendants were again moving to dismiss. And because a motion for leave to amend and a motion to dismiss turn on substantively the same standard, the Court can now address defendants' responses to the motion for leave to amend as addenda to their previously

---

[2] As set forth in the header of this opinion and order, "these cases" refers to *Walters* and *Sirls v. Michigan*, No. 17-cv-10342.

filed motions to dismiss and rule on both the motion for leave to amend and the motions to dismiss in a single omnibus decision.

This opinion will proceed as follows. Part II will address the motion for leave to file an amended master complaint. And for the reasons set forth below, the motion will be granted in part and denied in part. Then, in Part III, the Court will adopt the amended master complaint as the operative master complaint, and rule on defendants' motions to dismiss plaintiffs' short-form complaint in *Walters v. Flint*. In Part IV, the Court will do the same in *Sirls v. Michigan*. Finally, Part V will set forth the Court's order resulting from this opinion.

## Contents

I. Procedural History ............................................................................. 3
II. Motion for Leave to Amend the Master Complaint ........................... 7
   A.   Background ...................................................................................... 7
     i.   The Parties ................................................................................. 7
     ii.   Facts as Pleaded in the Proposed Master Complaint ............... 10
     iii.  Prior Flint Water Cases ........................................................... 31
   B.   Standard of Review ..................................................................... 32
   C.   Analysis ....................................................................................... 34
     i.   Undue Delay ............................................................................. 34
     ii.   Futility of Amendments ........................................................... 35
       a.Liane Shekter-Smith .................................................................. 35
       b.Bodily Integrity ......................................................................... 42

      c. Equal Protection ........................................................... 54

      d. Elliott-Larsen Civil Rights Act .................................... 66

      e. Conspiracy .................................................................. 70

      f. Gross Negligence ......................................................... 74

      g. Professional Negligence ............................................... 77

  D.    Conclusion .......................................................................... 77

III. Motions to Dismiss in Walters v. Flint, No. 17-cv-10164 ................. 78

  A.    Background ......................................................................... 78

  B.    Standard of Review ............................................................ 79

  C.    Threshold Issues ................................................................ 80

    i.     Sovereign Immunity ..................................................... 80

    ii.    Absolute Immunity ...................................................... 83

    iii.   Safe Drinking Water Act Preemption............................ 83

  D.    Analysis ............................................................................. 84

    i.     State-Created Danger.................................................... 84

    ii.    Bodily Integrity .......................................................... 91

    iii.   Equal Protection ........................................................ 100

    iv.  Conspiracy ................................................................ 100

    v.    Elliott-Larsen Civil Rights Act ................................... 101

    vi.   Gross Negligence ....................................................... 101

    vii.  *Monell* Liability........................................................ 102

    viii. Professional Negligence............................................. 103

    ix.  Damages .................................................................... 105

  E.    Conclusion ....................................................................... 108

IV. Motions to Dismiss in Sirls v. Michigan, No. 17-cv-10342 ............. 109

V. Order.................................................................................... 109

## II.  Motion for Leave to Amend the Master Complaint Filed in *Walters v. Flint*, No. 17-cv-10164

### A.  Background

#### i.  The Parties

Plaintiffs are residents of Flint, Michigan, a majority African American city located in the mostly white Genesee County. They allege that they suffered and continue to suffer injuries as a result of exposure to municipal water during the Flint Water Crisis. Their injuries range from hair loss, to skin rashes, to digestive, developmental, and cognitive issues, as well as damages from medical expenses, wage loss, and property damage. Plaintiffs blame defendants for these injuries and sue the following individuals and entities:

*The state defendants.* The former Governor of Michigan, Richard Snyder, is sued in his individual capacity for monetary damages and in his official capacity for injunctive relief.[3] Plaintiffs also sue Andrew Dillon, former Michigan State Treasurer; and Nick Lyon, former Director

---

[3] For the sake of consistency with earlier Flint water decisions, former Governor Snyder will be referred to as Governor Snyder or the Governor where the claim is against him is in his individual capacity. Where the claim is against him in his official capacity, the claim is now against current Governor Gretchen Whitmer. *See* Fed. R. Civ. P. 25(d). However, again, the Court will still refer to these claims as against Governor Snyder for the sake of consistency.

of the Michigan Department of Health and Human Services (MDHHS). Defendants Dillon and Lyon are both sued in their individual capacities.[4]

*The MDEQ defendants.* This group includes Daniel Wyant, former Director of the Michigan Department of Environmental Quality (MDEQ); Bradley Wurfel, former Director of Communications; Liane Shekter-Smith, former Chief of the Office of Drinking Water and Municipal Assistance; Stephen Busch, a former Water Supervisor for Lansing; Patrick Cook, a former specialist for the Community Drinking Water Unit; Michael Prysby, a former Environmental Quality District 8 Water Supervisor; and Adam Rosenthal, a former Water Quality Analyst. These defendants are sued in their individual capacities.

*The city defendants.* Plaintiffs sue Darnell Earley, Flint's Emergency Manager from November 1, 2013, until January 12, 2015; Gerald Ambrose, Flint's Emergency Manager from January 13, 2015, until April 28, 2015; Dayne Walling, the Mayor of Flint from August 4, 2009, until November 9, 2015; Howard Croft, Flint's former Director of

---

[4] In the proposed amended complaint that accompanies the motion for leave to amend, plaintiffs also include Eden Wells, Nancy Peeler, and Robert Scott. In a subsequent filing, plaintiffs clarified that these three individuals are no longer named defendants. (Dkt.186-1 at 19–21.)

8

Public Works; Michael Glasgow, the former City of Flint Laboratory and Water Quality Supervisor; and Daugherty Johnson, Flint's former Utilities Administrator. These defendants are sued in their individual capacities.[5] Additionally, on the basis of the alleged conduct of the above individuals, plaintiffs also sue the City of Flint.

*Jeffrey Wright.* Wright was, and still is, the Genesee County Drain Commissioner (GCDC). He is also the Chief Executive Officer of the Karagondi Water Authority (KWA). Wright is sued in his individual capacity.

*The private defendants.* This includes Lockwood, Andrews & Newman, PC, Lockwood Andrews & Newman, Inc., and the Leo. A. Daly Company (collectively LAN); Veolia, LLC, Veolia, Inc., and Veolia Water (collectively Veolia); and Rowe Professional Services Company (Rowe). LAN performed work as a consultant related to Flint's transition to the Flint River and continued to advise Flint on water quality issues during

---

[5] Edward Kurtz, Flint's Emergency Manager from August 2012 until July 2013, is also mentioned as a defendant in the allegations. (Dkt. 186 at 169–70, 173, 178, 183, 187.) However, the Court understands that plaintiffs did not intend to include him as a named defendant.

the Crisis.[6] Rowe did the same but in the capacity of the City of Flint's Engineer.[7] Finally, Veolia also performed consultancy work, but only after the transition and for a limited time from early January 2015 to March 2015.

### ii. Facts as Pleaded in the Proposed Amended Master Complaint

*Flint's water supply history.* The City of Flint abuts the seventy-eight mile long Flint River. The City is one of the largest in Michigan and for much of the early twentieth century relied on the Flint River for its primary source of water. (Dkt. 185-2 at 74.) For this reason, the Flint Water Treatment Plant (FWTP) was constructed in 1917 to treat the river's raw water. The FWTP enabled the City to safely distribute Flint River water to residents for use and consumption. (*Id.*)

Then, in 1964, the United States Geological Survey noted that the Flint River contained high levels of chloride. (*Id.*) Chloride reacts with

---

[6] Throughout this opinion, the Court uses the term "the Crisis" to refer to events that occurred after April 25, 2014, when Flint began drawing water from the Flint River.

[7] According to the amended master complaint, "[t]he Flint City Charter requires that Flint have somebody serving in the capacity of City Engineer. In order to receive State and Federal funding for projects, it is mandatory for Flint to have a City Engineer to certify and submit required documentation." (Dkt. 185-2 at 78.)

trace metals found in river water to form certain salts, making the water corrosive and difficult to process. As a result of this problem and others, Flint eventually stopped drawing water from the Flint River. (*Id.*) Starting in 1967, the City began to purchase water under contract from the Detroit Water and Sewerage Department (DWSD). The DWSD water was drawn from Lake Huron and treated before delivery. There was therefore no need to treat it at the FWTP, and the facility was deactivated. (*Id.* at 74–75.)

In addition to purchasing water for its own customers, Flint also resold DWSD water to the GCDC. The GCDC was responsible for the water supply to several municipalities within Genesee County, and it resold the water to those customers. (*Id.* at 75.) In accordance with this transaction, Flint and the GCDC entered into a contract in 1973. Flint promised to supply the GCDC with a sufficient quantity of water to meet its needs, and the GCDC committed to buying water from Flint so long as it met all regulatory standards. This contract was updated in 2003 and remained in effect leading up to the Crisis. (*Id.*)

*The formation of the Karegondi Water Authority.* For decades, this arrangement posed no problems. (*Id.* at 27.) But beginning in the 1990s,

Flint and other Genesee County communities began to grow concerned about the increasing cost of DWSD's water, and they commissioned studies to look at alternative sources. (*Id.* at 76.) The first of these was completed as early as 1992, but others followed. And more recently in 2009, LAN and Rowe completed a study which examined whether Flint and these communities should continue to buy water from DWSD, or whether they should construct a new pipeline to independently draw raw water from Lake Huron. (*Id.* at 76–77.)

Later that year, Flint and these other Genesee County communities formed the KWA to explore the possibility of constructing a new Lake Huron pipeline. (*Id.* at 27.) The KWA pipeline was projected to cost approximately $300 million to construct. And for its part, Flint would pay $85 million of that total and service about one third of the debt. (*Id.* at 27–28.) In addition, it would require treatment before being distributed to customers, because the water pumped from Lake Huron would be raw. (*Id.* at 28.) The long-since dormant FWTP would therefore need to be reactivated and upgraded to meet modern regulatory standards. (*Id.* at 34.) If the pipeline were constructed successfully, the KWA would

manage the supply of raw Lake Huron water to KWA member entities which would then be responsible for treating and distributing it.

*Committing to the KWA pipeline project.* In 2011, a panel appointed by Governor Snyder declared Flint to be in a state of financial emergency. As such, the panel recommended that an Emergency Manager be appointed to manage Flint's finances. Emergency managers may be appointed by the Governor of Michigan "to address a financial emergency within that local government." Mich. Comp. Laws § 141.1549(1). Pursuant to that recommendation, the Governor appointed Edward Kurtz to the position. (*Id.* at 29.) This meant that Kurtz and his successors would "act for and in the place and stead of the governing body" of Flint. § 141.1549(2). This gave Kurtz broad control over municipal policymaking, *see id.*, subject only to the authority of Governor Snyder, *see* § 141.1549(3)(d), or the State Treasurer, *see* § 141.1549(8).

Consistent with his mandate, Kurtz began to evaluate the fiscal prudence of the KWA project. In November 2012, Kurtz wrote to the State Treasurer, Andrew Dillon, suggesting that Flint commit to the KWA pipeline because it would result in Flint saving money. (Dkt. 185-2 at 29.)

This was an opinion shared by Jeffrey Wright, the Genesee County Drain Commissioner, CEO of the KWA, and a vocal opponent of the DWSD. (*Id.*)

The DWSD disagreed with Kurtz's evaluation. Throughout 2012, it presented cost studies to Kurtz, Wright, Dillon, and the Governor that refuted Kurtz's position. All of these studies demonstrated that from a cost and reliability standpoint, Flint was better off continuing to buy DWSD water rather than committing to the KWA pipeline. (*Id.*) Seeking additional input, Dillon commissioned an independent cost study. (*Id.* at 29–30.) In February 2013, this study concluded that it would be more economical for Flint to continue to purchase DWSD water on both a short and long-term basis. (*Id.* at 30.)

Throughout 2013, Flint continued to negotiate with the DWSD while weighing the benefits of the KWA pipeline project. In April, the DWSD presented a proposal that purported to save the City twenty percent over a thirty-year period when compared to the KWA project. (*Id.* at 31.) This offer even got the attention of senior state officials, including Dillon, who wondered why Flint would proceed with the KWA pipeline in the face of such savings. (*Id.* at 31–32.)

Despite this, Flint continued to evaluate the KWA plan. Several KWA member communities had committed to the KWA pipeline by the spring of 2013. (*Id.* at 33.) But Wright believed that it would be difficult to finance the cost of the project without also obtaining Flint's participation and financial support. Wright therefore turned his attention to securing Flint's participation. He aggressively argued the case for Flint's involvement in the KWA to senior government officials and to the media, and he refuted claims that staying with DWSD water would be the economical choice for Flint. (*Id.*)

In March 2013, Dillon recommended to the Governor that Flint commit to the KWA project, despite Dillon recognizing that studies and the last DWSD proposal counseled against it from a cost perspective. (*Id.* at 30, 32–33.) In response, the Governor ordered the DWSD to submit a final proposal to continue as Flint's water supplier. As directed, the DWSD issued this final offer in April 2013, which Flint rejected. (*Id.* at 34.) And the Governor authorized Kurtz to bind Flint to the KWA project. (*Id.* at 34–35.)

Kurtz committed Flint to the KWA pipeline soon after. (*Id.* at 80–81.) The DWSD attempted to get Flint to reconsider. But when Flint

declined, the DWSD gave notice that it would terminate its contract with Flint, effective one year from that date, in April 2014. (*Id.* at 81.) After that time, if Flint wanted to purchase water from DWSD, it would have to do so under more expensive non-contract prices.

*Devising the interim plan.* The decision to commit to the KWA pipeline left Flint with a problem. The pipeline would not be ready until late 2016, maybe even early 2017 (*id.* at 35), meaning that Flint would have to identify an interim supply of water. It could continue to buy water from the DWSD on an ad-hoc basis at a non-contract price. (*Id.* at 137.) Alternatively, it could seek out a different source of water.

In June 2013, Dillon, Kurtz, Wright, and Flint's Mayor, Dayne Walling, devised a solution. (*Id.* at 36.) They decided to use the Flint River as an interim source of water rather than continuing to buy from the DWSD. A critical part of this interim plan was to shift funds that would have paid for the treated DWSD water to purchase the necessary upgrades for the FWTP in order for it to safely process the raw Flint River water. (*Id.*) The FWTP would need upgrading to process the water drawn from the eventual KWA pipeline from Lake Huron in any case, so this plan also served that wider purpose. However, the interim plan did not

include a plan for how to implement the necessary FWTP upgrades and remediation. (*Id.* at 35–36.) These individuals knew that these details still needed to be worked out, as did the Governor. (*Id.*)

At the same time, it was widely known that the Flint River had been evaluated and rejected as a possible water source on prior occasions. (*Id.* at 36.) As far back as 1964, concerns had been raised about the river's chloride content. (*Id.* at 74.) And years of rock salt washing into the river from winter roads had exacerbated this problem, increasing the corrosive nature of the water. (*Id.* at 87.) In addition, a 2001 report by Michigan's Department of Natural Resources noted that factories along the Flint River discharged their industrial waste into the river. (*Id.* at 76.) Unsurprisingly, the United States Geological Society, the MDEQ, and the Flint Water Utilities Department had all reported that "the Flint River was a highly sensitive drinking water source that was susceptible to contamination." (*Id.*)

More recently, Flint had asked LAN and Rowe in 2011 to determine whether the Flint River could be used as a primary drinking source for the City. (*Id.* at 28, 77.) Rowe and LAN cautioned against it and warned that the dormant FWTP would require millions of dollars in upgrades in

order to treat the raw river water safely. (*Id.* at 28, 78.) In addition, water from the river would require more effort to treat than water from the eventual KWA pipeline, which would draw from Lake Huron. (*Id.* at 79.) LAN's analysis in particular noted a need to use chemicals to neutralize the river's corrosive properties. (*Id.* at 77–78.)

Prior to the development of the interim plan, government officials had openly expressed concern about using the Flint River as a water source. In March 2013, Stephen Busch, an MDEQ District Supervisor, sent an email to MDEQ Director Daniel Wyant expressing concern that the Flint River would "[p]ose an increased microbial risk to public health[,] . . . an increased risk of disinfection by-product exposure . . . [, and] trigger additional regulatory requirements." (*Id.* at 30–31.) He stated that the FWTP would require significant upgrades above and beyond those required to treat water drawn from Lake Huron. Busch recognized that any decision to use the Flint River as a water source would be primarily based on cost and not a scientific assessment of its suitability. (*Id.* at 32.) Using the Flint River as a water source presented a challenging proposition.

Nonetheless, the interim plan was put into action as a cost-cutting measure when compared with purchasing DWSD water at a non-contract price. (*Id.* at 81.) The planned transition date was April 2014, set to coincide with the termination of the DWSD agreement. (*Id.* at 84.) The interim plan did not apply to the remainder of Genesee County, which would continue to purchase DWSD water. *(Id.* at 40–41.)

*Transitioning to the Flint River.* Shortly after the interim plan was devised, Kurtz hired LAN to provide advice on the transition to and use of the Flint River as a water source. (*Id.* at 81.) LAN would act as design engineer for the FWTP upgrade process and, more broadly, as a consultant on water quality issues leading up to and after the transition. (*Id.* at 81–83.) In June 2013, LAN met with representatives from Flint, the GCDC, and the MDEQ. (*Id.* at 84.) They discussed FWTP upgrades, water quality control, and the ability to meet the April 2014 deadline. (*Id.* at 84–85.) The attendees determined that the Flint River was a viable water source. Although it would be more difficult to treat than other water sources, these difficulties could be overcome. In LAN's view, the April 2014 timeframe was feasible. (*Id.* at 85.)

Kurtz resigned as Flint's Emergency Manager effective July 2013. (*Id.* at 37.) He was eventually replaced by Darnell Earley in September of that year. (*Id.*) This change in leadership had no effect on the plan to use the Flint River as an interim water source nor the scheduled timeline for the transition.

As the April 2014 deadline approached, concerns began to surface about how ready the City was to begin drawing water from the Flint River. A senior official from the Governor's office warned the Governor that the transition timeframe was too rushed and that there was a possibility of something going wrong. (*Id.* at 37–38.) Moreover, Michael Glasgow, Flint's water treatment plant operator, informed the MDEQ that the FWTP was not fit to begin operations and that he was not ready to give his approval for it to begin active service. (*Id.* at 38–39.)

During this time, LAN met with Flint and MDEQ officials to finalize the optimal corrosion control to treat water drawn from the Flint River. (*Id.* at 86.) Crucially, they decided to wait for more data before implementing a corrosion control protocol. As a result, no corrosion control measures were put in place to neutralize the chloride salts present in the Flint River water. (*Id.* at 87–88.)

With these concerns hanging over the transition, the City submitted its application for MDEQ approval to make the switch to the Flint River on March 31, 2014. (*Id.* at 138.) This application proposed various capital projects that would take at least two months to complete. (*Id.* at 140.) But just nine days after it was submitted, MDEQ employee Patrick Cook approved it and gave the switch the green light. (*Id.* at 138.) Under the direction of Emergency Manager Earley, Flint water users began receiving the river's water on April 25, 2014. (*Id.* at 40.)

*Effect on Flint's water infrastructure.* Most of Flint's water distribution pipelines are over seventy-five years old and constructed of cast iron.[8] (*Id.* at 91.) Cast iron pipes are subject to internal corrosion, which causes buildup on the pipe interior, leading to water quality issues, reduced flow, and even leakage. This process also results in the development of biofilms—layers of bacteria that attach to the interior of the pipe wall. (*Id.*) At the time the FWTP began drawing water from the Flint River, it was corrosive due to the increased presence of chloride

---

[8] Water distribution pipes transport treated drinking water to consumers. These pipes may be large in diameter, which supply entire towns, or they may be smaller pipes that branch off the larger ones to supply a particular street or group of buildings.

salts, and it was not being treated to neutralize this property. (*Id.* at 87–88.) This resulted in the layer of internal buildup being stripped from the pipe. The biofilms went with it, releasing potentially harmful bacteria into the water supply. (*Id.* at 89.) The pipe metal was left exposed and lay open to the water's corrosive properties. (*Id.*)

In April 2014, a large percentage of Flint's exterior service lines were also many decades old,[9] and these were mostly made out of lead. (*Id.* at 92.) The corrosive water stripped the buildup from these pipes too. The exposed pipework began to leach lead and bacteria into the City's water. (*Id.*) Lead is toxic, and there is no safe level of exposure. Lead is particularly damaging to children because even low-level lead exposure can result in reduced intelligence, shortening of attention span, and increased antisocial behavior. (*Id.* at 111–12.)

*Initial warning signs.* Almost immediately following the transition, users began complaining about Flint's new water source. (*Id.* at 44.) The Governor's office began receiving customer grievances, and numerous press stories were written about Flint's water quality problems. (*Id.* at 44 n.4.)

---

[9] An exterior service line connects a building to the main distribution pipelines.

In August 2014, Flint's water tested above the legal limits for total coliforms, including potentially fatal pathogens. (*Id.* at 89.) As a short-term solution, the City issued boil-water advisories that lasted into September. In an attempt to permanently address the issue, Flint officials began adding more chlorine to the water to kill the bacteria. (*Id.*)

Chlorine in water reacts with organic and inorganic matter, producing byproducts collectively referred to as trihalomethanes. (*Id.*) The EPA regulates several types of trihalomethanes in drinking water, and the collective concentration of these compounds is known as the Total Trihalomethanes (TTHM) count. However, chlorine reacts preferentially with metal. (*Id.* at 101.) So as the metal pipes were stripped bare, more and more chlorine was needed to neutralize the coliforms. The increased quantity of chlorine in turn raised the TTHM count. (*Id.* at 89.) The inability to treat coliforms such as *E. coli* with chlorine is indicative of a problem with pipe corrosion. (*Id.* at 103.) And the resulting high TTHM levels were an indicator of this underlying problem. (*Id.* at 89.) MDEQ officials Busch, Prysby, and Adam Rosenthal, a water quality analyst, were aware in May 2014 that TTHM levels were elevated and above regulatory mandated levels. (*Id.* at 89–90.)

The complaints continued to grow such that by October 2014, Flint's water problems were under serious discussion in the Governor's office. (*Id.* at 44.) In addition, the MDHHS was notified of an outbreak of Legionnaires' disease, a deadly illness caused by *legionella* bacteria which can enter the water supply when biofilms are stripped from old metal piping. (*Id.* at 90.) Lead poisoning rates for the months of July, August, and September were also dramatically higher than usual for children living in Flint. Yet no government official took any action, despite suggestions by senior staff in the Governor's office that Flint should begin to purchase water from DWSD until water quality could be assured for Flint's residents. The fact that the Genesee County Health Department began to connect the increased incidence of *legionella* with Flint's water did nothing to activate a response. (*Id.* at 45 n.6.)

As the winter of 2014 drew nearer, a large customer with the ability to do so stopped using Flint's water. General Motors (GM) switched from the City of Flint water system to Flint Township's water (drawn from Lake Huron) for its Flint engine operations facility. (*Id.* at 45 n.7.) And while the MDEQ stated at this time that there was nothing unusual about the chloride content in Flint's water, GM cited corrosion concerns

for its decision. (*Id.* at 45, 91.) The loss of GM as a customer resulted in an annual revenue loss for the City of $400,000. (*Id.* at 45 n.7.)

The import of GM's decision was not lost on senior members of Governor Snyder's staff who again suggested that Flint resume purchasing DWSD water. (*Id.* at 45.) But again, no action was taken. When Earley was directly briefed on the issue of GM's switch by the Governor's staff, he rejected the idea of reconnecting to DWSD water. (*Id.* at 46.) This was despite the fact that the Governor's own Chief of Staff described the situation as "downright scary" and called for a return to DWSD "ASAP." (*Id.*)

The Crisis continued to develop. At the same time, water coolers were installed in Flint's state government buildings. This left MDEQ officials to discuss the optics of such a move, given the government's public message that Flint's water was safe for human consumption. (*Id.* at 47.) Additionally, the University of Michigan turned off certain drinking fountains located on its Flint campus because of high lead levels. (*Id.* at 92.) And test results began to show that Flint's water exceeded the regulatory standards governing lead levels in drinking water. (*Id.* at 91.)

*From warning signs to alarm bells.* In January 2015, Earley resigned and was replaced as Emergency Manager by Gerald Ambrose. (*Id.* at 47.) Around this time, state officials recognized that the problems with Flint's water were being caused by pipe corrosion. (*Id.* at 48 n.13.) The DWSD approached Ambrose and offered him the opportunity to purchase water at attractive rates and even offered to waive the reconnection fee. (*Id.* at 48–49.) But Ambrose rejected the proposal, even though there had been months of complaints that the water was discolored, foul smelling, bad tasting, and making families sick. (*Id.*) The Governor was briefed on the severity of the situation, but again, neither state nor local officials took any corrective action. (*Id.* at 49–50.)

In February 2015, in an effort to address the public health emergency, the City hired Veolia and rehired LAN to review the City's water system. (*Id.* at 96.) Veolia issued an interim report a week later, indicating that Flint was in compliance with drinking water standards. (*Id.* at 97–98.) The company issued its final report in March, confirming its interim opinion, raising no other concerns, and stating that "[s]ome people may be sensitive to any water." (*Id.* at 98–99.) LAN also issued a report addressing the TTHM problem, but neither Veolia nor LAN

recommended that additional steps be taken to address the corrosivity of the water. (*Id.* at 99–100.) Veolia recommended the addition of ferric chloride to help address the TTHM problem. However, this likely worsened the corrosive nature of the City's water by increasing the water's acidity. (*Id.* at 106–07, 110.)

That same month, Flint residents began staging public demonstrations to demand a return to DWSD water and the Environmental Protection Agency (EPA) responded to complaints raised by Flint water users. (*Id.* at 49–50.) A resident, LeeAnne Walters, had complained of black sediment in her water. The EPA noted that the iron content of the water was so high that testing instruments could not measure it, concluded that the black sediment was lead, and began to inquire further. (*Id.*) As part of that investigation, MDEQ supervisor Busch falsely advised the EPA that Flint was using optimized corrosion control. The MDEQ dismissed the possibility of the black sediment being lead because, in the MDEQ's view, the complaint came from a resident whose house contained plastic plumbing. (*Id.* at 51 n.18.) It was not until April 2015 that the MDEQ admitted to the EPA that the FWTP had no corrosion control protocol in place. (*Id.* at 55.)

By March 2015, it was becoming clear that a major public health emergency existed. (*Id.* at 52.) Officials recognized that this probably included widespread lead poisoning and an increased risk of *legionella* exposure. The Governor and officials in his office discussed the possibility of distributing water filters to Flint residents, but they decided not to do so. (*Id.*) Instead, government officials continued to defend the decision to use the Flint River as an interim water source. (*Id.* at 52 n.20.) Moreover, officials began discrediting independent parties who were publishing data that showed elevated lead levels in Flint's water. (*Id.*) MDEQ officials continued to deny the link between Flint's water and *legionella*. (*Id.* at 53–54.) Emergency Manager Ambrose vetoed a Flint City Council vote to reconnect to DWSD water. (*Id.* at 54.)

As the summer began, the EPA continued to monitor the situation. In June 2015, the EPA prepared an internal memorandum titled "High Lead in Flint Michigan-Interim Report" and shared it with MDEQ staff. (*Id.* at 56.) In the words of one EPA employee, the government's response to the Crisis "border[ed] on criminal neglect." This did not prompt state or local officials to address the risk of harm faced by Flint's water users, even though the EPA began to speak publicly about the possible dangers.

(*Id.*) Instead, government officials again denied that there was a problem. In July, MDEQ Communications Director Bradly Wurfel appeared on television and radio to deny that there was any problem with Flint's water, despite all evidence to the contrary. (*Id.* at 57, 59.) At the same time, the Governor was warned by his Chief of Staff that complaints about the water were being inappropriately "blown off" by government officials, yet the Governor continued to do nothing. (*Id.* at 58.)

As the summer drew to a close, the Crisis became impossible to deny. Private individuals such as Dr. Hanna-Attisha, a Flint area pediatrician, began pointing out flaws with Flint's water quality testing procedures and speaking publicly about possible lead poisoning. Then, Professor Marc Edwards of Virginia Polytechnic Institute and State University determined in August 2015 that there was serious lead contamination and highlighted how the situation was being covered up. (*Id.* at 59–61.) In response, the MDEQ falsely stated that the MDHHS had reexamined blood lead level data and found nothing to affirm Dr. Hanna-Attisha's data. (*Id.* at 63–64.) Wurfel discredited Edwards and continued to assure the public that Flint's water was safe. (*Id.* 60–61, 63–64.) MDEQ officials Busch, Prysby, and Glasgow subsequently conspired

to alter water quality reports to remove the highest lead level test results. (*Id.* at 60–61.)

On October 8, 2015, the Governor publicly admitted that Flint's water supply was compromised and ordered the City to reconnect to the DWSD. This reconnection occurred on October 16. (*Id.* at 64.) On October 18, MDEQ Director Wyant admitted to the Governor that the FWTP had failed to implement corrosion control from the outset. (*Id.* at 65.) Wyant claimed that this was due to an incorrect understanding of the regulatory requirements. (*Id.*)

*Aftermath.* Although government officials at last publicly admitted the nature of the Crisis and ordered Flint to reconnect to DWSD water, the health threat did not dissipate. Flint's corroded water infrastructure continued to leach lead and bacteria into the water. The pipes, stripped bare by the Flint River's corrosive water, did not instantaneously regain their earlier protective film with the change in water. The dangers were still present. Yet government officials issued misleading statements that continued to downplay the risks of harm posed by Flint's water. (*Id.* at 67.) This was even so once Governor Snyder was informed in December 2015 that the risk posed by elevated lead levels and *legionella* was

ongoing. (*Id.* at 66.) It was not until January 6, 2016, that the Governor publicly accepted that the risks due to lead exposure were still ongoing. (*Id.* at 67.) It then took him until January 13 to do the same for Legionnaires' disease, issuing a state of emergency in Flint and activating the Michigan National Guard to assist the City's residents. (*Id.*)

This was almost two years after the transition to the Flint River. The long delay between Governor Snyder publicly admitting that the Crisis existed and declaring a state of emergency was at odds with how he handled disasters in other majority white Michigan communities, where he would typically issue states of emergencies within days following a disaster. (*Id.* at 150–56.)

### iii.   Prior Flint Water Cases

The Flint Water Cases have already produced several Sixth Circuit opinions. These are binding on the Court and include *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019); *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017); and *Mays v. City of Flint*, 871 F.3d 437 (6th Cir. 2017). The Court will also adhere to its previous decisions where appropriate. These include *Guertin v. Michigan*, No. 16-cv-12412, 2017 U.S. Dist. LEXIS

85544 (E.D. Mich. June 5, 2017) and *Carthan v. Snyder*, No. 16-10444, 2019 U.S. Dist. LEXIS 55607 (E.D. Mich. Apr. 1, 2019).

## B.  Standard of Review

Plaintiffs seek leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). Rule 15(a)(2) states that "a party may amend its pleading only with . . . the court's leave." Fed. R. Civ. P. 15(a)(2). However, "court[s] should freely give leave when justice so requires." *Id.*; *see also Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010).

When evaluating the interests of justice, courts consider various factors. These include "'[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, [and] undue prejudice to the opposing party.'" *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 458–59 (6th Cir. 2001) (quoting *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir.1989)). Mere delay on its own is insufficient to warrant denial. *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001) (citing cases). Rather, courts examine the competing interests of the litigants and the likelihood of prejudice to the nonmoving party. *See Morse v. McWhorter*,

290 F.3d 795, 799 (6th Cir. 2002) (citing *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986)). But regardless of the equities, leave must be denied if an amendment would be futile. *Parchman v. SLM Corp.*, 896 F.3d 728, 738 (6th Cir. 2018) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"A proposed amendment is futile if [it] could not withstand a Rule 12(b)(6) motion[.]" *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Riverview Health Inst. LLC v. Med. Util. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010)). Under Rule 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And although a plausible claim need not contain "detailed factual allegations," it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Ultimately, the test is whether a "plaintiff [has] plead[ed] factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

## C. Analysis

### i. Undue Delay

The MDEQ defendants argue that plaintiffs should be denied leave to amend the master complaint because they will be prejudiced if leave to amend is granted. (Dkt. 203 at 10.) They contend that plaintiffs could have brought these amendments much sooner. By belatedly bringing them, the MDEQ defendants assert that plaintiffs have created the need for defendants to rethink their litigation strategy. (*Id.* at 10–11.)

As the Court held in *Carthan*:

> It is true that the present case has been pending for several years[,] . . . and if this were a routine case, [an] attempt to amend the pleadings . . . might be unusual. But this litigation is far from routine. The harm alleged and the number of parties involved are extraordinary. What started out as a series of individual suits has become a large consolidated action. And the complex nature of the claims coupled with less than straightforward procedure must be considered. This weighs in plaintiffs' favor.

> Conversely, defendants do not explain how they will be prejudiced. Having resisted the start of discovery, they cannot claim that they will be subject to duplicative discovery. *See Morse*, 290 F.3d at 800–01. Plaintiffs have not changed their allegations so much that defendants will need to completely overhaul their strategy. *See Prather v. Dayton Power & Light Co.*, 918 F.2d 1255, 1259 (6th Cir. 1990). And the [proposed]

> complaint does not contain new claims so far outside the scope
> of the [operative] complaint such that granting leave to amend
> may later lead to confusion. *See Lover v. D.C.*, 248 F.R.D. 319,
> 323 (D.D.C. 2008).

2019 U.S. Dist. LEXIS 55607, at *65–66. The same is true here. Defendants are often inconvenienced to some extent when a complaint is amended, but this does not amount to prejudice. Plaintiffs in other Flint Water Cases have been granted leave to make similar, if not identical, amendments, providing notice to defendants of the possibility of these proposed changes. *See Carthan*, 2019 U.S. Dist. LEXIS 55607. As a result, leave to amend will not be denied due to undue delay.

### ii.   Futility of Amendments

The Court will assess each proposed amendment for futility. To the extent an amendment would be futile—that is, unable to withstand a motion to dismiss if leave to amend were granted—leave will be denied.

### a. Liane Shekter-Smith

The MDEQ defendants argue that plaintiffs should be denied leave to amend the complaint to add Liane Shekter-Smith as a defendant. They contend that adding a new defendant does not relate back to the original pleading. (Dkt. 203 at 9.) And in their view, Shekter-Smith can therefore only be added if the proposed claims against her are within the applicable

statutes of limitations. (*Id.*) The MDEQ defendants argue that the limitations period has run, making it futile to add Shekter-Smith. (*Id.* at 6–9.) The MDEQ defendants are correct and leave to add Shekter-Smith as a defendant is denied.

Statutes of limitations protect defendants from having to defend against claims brought many months or years after an alleged wrongdoing. They specify the amount of time a plaintiff has to act on a claim, starting from the point at which the claim accrues and a lawsuit could be filed. *See Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003) (citing cases). These statutes prevent plaintiffs from sitting on their rights and later surprising defendants once unfavorable evidence is lost and the memories of witnesses have faded. *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) (citing *R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49 (1944)). For similar reasons, statutes of limitations also prohibit a plaintiff from substantially amending an existing complaint unless those changes "relate[] back" to the initial pleading. *See* Fed. R. Civ. P. 15(c). This may be where, for example, an "amendment asserts a claim or defense that arose out of the [same] conduct, transaction, or occurrence." *Id.* at (c)(1)(B).

But the addition of a defendant represents a new cause of action and does not relate back to the original complaint. *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010) (citing cases). As such, a plaintiff looking to add a claim against a new defendant must do so within the period of time set out in the appropriate statute of limitations.

In this case, plaintiffs seek leave to bring several personal injury and property damage causes of action against Shekter-Smith. This includes four federal counts brought under 42 U.S.C. § 1983, one under Michigan's Elliott Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws §§ 37.2101–2804, and a state-law gross negligence claim. (Dkt. 186 at 165–78, 183–90.) The applicable limitations period for all four of these claims is three years. *Compare* Mich. Comp. Laws Ann. § 600.5805(10) (2013 amended 2018) ("[T]he period of limitations is 3 years . . . for all actions to recover damages . . . for injury to a person or property."), *with Wallace v. Kato*, 549 U.S. 384, 387–88 (2007) (citing cases) (explaining that state personal injury statutes of limitations apply to §1983 claims). Plaintiffs filed this motion for leave to amend the master complaint on November 28, 2018. (Dkt. 185.) Therefore, plaintiffs' attempt to add

Shekter-Smith as a defendant will be futile unless their claims against her accrued no more than three years earlier on November 28, 2015.

Although the limitations period for a § 1983 claim is taken from state law, the accrual date is governed by federal law. *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). And "[a]s a general rule, a claim accrues [under federal law] 'when the plaintiff can file suit and obtain relief.'" *Jordan v. Blount Cty.*, 885 F.3d 413, 415 (6th Cir. 2018) (quoting *Kato*, 549 U.S. at 388). This is "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Printup v. Dir., Ohio Dep't of Job & Family Servs.*, 654 F. App'x 781, 785 (6th Cir. 2016) (quoting *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)).

Michigan state law claims accrue at a different point. They "accrue[] at the time the wrong upon which the claim is based was done." Mich. Comp. Laws Ann. § 600.5827. And "[t]he wrong is done when the plaintiff is harmed rather than when the defendant acted." *Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 388 (2007) (citing *Boyle v. Gen. Motors Corp.*, 468 Mich. 226, 231 n.5 (2003)). So unlike a federal claim, a

Michigan state law claim may accrue before the plaintiff knows or even has reason to know of any harm. The statute of limitations is not tolled while the plaintiff learns of her injury.[10] *See Chandler v. Wackenhut Corp.*, 465 F. App'x 425, 430 (6th Cir. 2012) (citing *Trentadue*, 479 Mich. at 389) (explaining that the statute of limitations under Michigan law is not tolled by the common law discovery rule).

For the purposes of this case, it is sufficient that plaintiffs' claims against Shekter-Smith accrued on October 19, 2015, at the latest. To the extent that Shekter-Smith injured plaintiffs, they allege that she did so by "approv[ing] and participat[ing] in . . . decisions that deliberately created, increased, and prolonged the public health crisis." (Dkt. 186 at 12.) She could only have done this while she worked in her role as the Chief of the MDEQ Office of Drinking Water and Municipal Assistance. But Shekter-Smith left office on October 19. (*Id.*) So, for state law purposes, plaintiffs were injured by Shekter-Smith at some point before then. Additionally, around the same time, Governor Snyder publicly

---

[10] The *Trentadue* rule can be difficult to apply. In environmental cases in particular, it is possibly easier to ascertain the point at which a plaintiff should have objectively been aware of an injury, rather than to establish with specificity the point at which a plaintiff was in fact injured. *See Henry v. Dow Chem. Co.*, 319 Mich. App. 704 (2017), *rev'd in part*, 501 Mich. 965 (2018).

admitted that Flint's water was dangerously contaminated. (*Id.* at 148.)
Thus, for federal law purposes too, plaintiffs knew or should have known
of their injury by that point at the very latest.

Because plaintiffs' claims accrued by October 19, 2015, they had
until October 19, 2018, to add Shekter-Smith as a defendant. As set forth
above, they did not; they waited another month to do so. (Dkt. 185.) And
as such, their effort to add Shekter-Smith now is untimely.

In response, plaintiffs argue that the limitations period has been
tolled. Specifically, plaintiffs argue that the limitations period has been
paused pursuant to *American Pipe & Construction Company v. Utah*, 414
U.S. 538 (1974). This is because, in their view, they are putative members
of a timely filed class action. (Dkt. 215 at 13.) And according to plaintiffs,
the filing of a class action suspends the limitations period with respect to
all possible class members, including them, despite their separate
pending lawsuit. (*Id.*)

In *American Pipe*, the Supreme Court held that the filing of a class
action tolls the running of the statute of limitations for all putative class
members who later file timely motions to intervene after a denial of class
certification. 414 U.S. at 552–53. A contrary ruling would rob class

actions of their principle virtue: economy of litigation. *Id.* at 553. To hold otherwise would encourage class members to file protective motions to intervene, even though intervention may be unwarranted. *Id. American Pipe* was later extended to cover plaintiffs who file separate actions after the denial of class certification. *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353–54 (1983).

However, plaintiffs, here, are not entitled to *American Pipe* tolling. *American Pipe* governs the situation where a plaintiff files a cause of action after class certification has been denied. But the Flint Water consolidated class action, *Carthan v. Snyder*, No. 16-cv-10444, has yet to apply for class certification. The Sixth Circuit has "declined to extend *American Pipe* tolling to plaintiffs who file individual actions *before* the district court rules on class certification." *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 788–89 (6th Cir. 2016) (citing *Wyser–Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553 (6th Cir.2005)). After all, the economy of litigation that *American Pipe* sought to promote is not furthered when class members hedge their bets by filing individual lawsuits at the early stages of class litigation. *Wyser–Pratte*,

413 F.3d at 569.[11] Therefore, plaintiffs cannot rely on *American Pipe* to toll the applicable limitations period.[12]

In sum, granting leave to add Shekter-Smith as a defendant would be futile. And for this reason, the Court denies plaintiffs leave to do so. Moreover, plaintiffs had sufficient notice of Shekter-Smith's alleged wrongdoing; she has been a named defendant in other Flint Water Cases. Plaintiffs were free to seek leave to amend the complaint at an earlier juncture.

### b. Bodily Integrity

Plaintiffs seek leave to amend the master complaint to include additional allegations against defendants Snyder, Wyant, Rosenthal, Cook, Glasgow, Prysby, Johnson, and Croft.[13] (Dkt. 185-1 at 14.) They argue that these additional allegations support a claim that defendants

---

[11] The Court recognizes that this is the minority rule among federal circuits, *Stein*, 821 F.3d at 789 (citing cases), but it controls the Court's decision.

[12] Nor can plaintiffs rely on equitable tolling. *Compare LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 (6th Cir.1995) (explaining that state law tolling principles apply to § 1983 claims), *with Trentadue*, 479 Mich. at 407 (permitting equitable tolling under state law in limited circumstances not relevant here).

[13] Plaintiffs also seek leave to include additional allegations against Shekter-Smith. For the reasons discussed above in Section II.C.ii.a., leave to amend is denied. Shekter-Smith will not be discussed again in this opinion.

violated their right to bodily integrity. (*Id.* at 14–15.) As such, plaintiffs conclude that leave should be granted so that they can pursue the substance of this claim on the merits. (*Id.* at 15.)

The Court has addressed the right to bodily integrity on several prior occasions. Most recently, in *Carthan*, the Court set out the governing legal standard:

> The right to bodily integrity is a fundamental interest protected by the Due Process Clause of the Fourteenth Amendment. *Guertin*, 912 F.3d at 918–19; *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *63 (citing *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). And although violations of the right to bodily integrity usually arise in the context of physical punishment, the scope of the right is not limited to that context. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062–63 (6th Cir. 1998). For instance, the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Guertin*, 912 F.3d at 919 (citing *Washington v. Harper*, 494 U.S. 210, 229 (1990)). And "compulsory treatment with anti-psychotic drugs may [also] invade a patient's interest in bodily integrity." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *66 (citing *Lojuk v. Quandt*, 706 F.2d 1456, 1465–66 (7th Cir. 1983)). The key is whether the intrusion is consensual. *See Guertin*, 912 F.3d at 920. There is no difference between the forced invasion of a person's body and misleading that person into consuming a substance involuntarily. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *71 (citing *Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313–14 (D. Mass. 1999)). As such, officials can violate an individual's bodily integrity by introducing life-threatening substances into that person's body without their consent. *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *65 (citing *Washington*, 494 U.S. at 229).

However, to state a claim, plaintiffs must do more than point to the violation of a protected interest; they must also demonstrate that it was infringed arbitrarily. *Guertin*, 912 F.3d at 922. *But see Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (observing that in some contexts government action may violate substantive due process without a liberty interest at stake). And with executive action, as here, only the most egregious conduct can be classified as unconstitutionally arbitrary. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In legal terms, the conduct must "shock[ ] the conscience." *Guertin*, 2017 U.S. Dist. LEXIS 85544, at \*63 (quoting Lewis, 523 U.S. at 846).

Whether government action shocks the conscience depends on the situation. *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). Where unforeseen circumstances demand the immediate judgment of an executive official, liability turns on whether decisions were made "maliciously and sadistically for the very purpose of causing harm." *Lewis*, 523 U.S. at 852–53 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). But where an executive official has time for deliberation before acting, conduct taken with "deliberate indifference" to the rights of others "shocks the conscience." *See Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). This case involves the latter of these two situations. And as a result, plaintiffs must demonstrate that (1) officials knew of facts from which they could infer a "substantial risk of serious harm," (2) that they did infer it, and (3) that they nonetheless acted with indifference, *Range*, 763 F.3d at 591 (citing *Ewolski*, 287 F.3d at 513), demonstrating a callous disregard towards the rights of those affected, *Guertin*, 912 F.3d at 924 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 730 (6th Cir. 2005)).

2019 U.S. Dist. LEXIS 55607, at \*67–69. The same legal standard applies

here. As set forth in *Carthan*,

[P]laintiffs point to a bodily integrity violation. This is not a case about the right to a contaminant-free environment or clean water. *But see Guertin*, 912 F.3d at 955-57 (McKeague, J., dissenting). Rather, this case implicates the consumption of life-threatening substances. Indeed, neither side disagrees that lead and legionella are life threatening, nor that plaintiffs ingested these contaminants and others through the water supply. This intrusion was also involuntary. "[I]t was involuntary because defendants hid from plaintiffs that Flint's water contained dangerous levels of lead," *Guertin*, 2017 U.S. Dist. LEXIS 85544, at *71, and, "because under state and municipal law, plaintiffs were not permitted to receive water in any other way[,]" *id.* (citing Flint Code of Ord. §§ 46-25, 46-26, 46-50(b)). Plaintiffs' claim therefore implicates the right to bodily integrity.

*Id.* at *69–70. Accordingly, the Court will apply this standard to the factual allegations pleaded here. Each defendant will be addressed in turn.

*Governor Snyder*. Plaintiffs plead a plausible bodily integrity claim against Governor Snyder. In *Carthan*, the Court stated that

Plaintiffs . . . plead facts which, when taken as true, show that Governor Snyder was deliberately indifferent. First, plaintiffs plausibly allege that Governor Snyder knew of facts from which he could infer that plaintiffs faced a substantial risk of serious harm. As early as March 2014, members of the Governor's administration were warning that transitioning to the Flint River could lead to a potential disaster. Initial warning signs included an outbreak of Legionnaires' disease in the Flint area. And by October 2014, senior staff, including the Governor's Chief of Staff, were discussing the need to return to DWSD water because of a growing awareness that the treated Flint River water did not

45

meet established quality standards. In July 2015, this clamor continued to build when the Governor's Chief of Staff wrote that concerns over lead contamination were being inappropriately dismissed. There was also a public outcry. Concerned religious leaders informed the administration of problems with the Flint River. News articles discussed lead in Flint's drinking water. And General Motors stopped using Flint water because it was corroding machinery. Considering the seriousness of the potential problem, the widespread reports, and the seniority of the government staff involved, it is reasonable to infer from plaintiffs' allegations that Governor Snyder was aware of this information. As a result, the Governor possessed sufficient facts from which he could have deduced that plaintiffs faced a substantial risk of serious harm from the Flint River.

Second, plaintiffs successfully claim that Governor Snyder did in fact infer that plaintiffs faced such a risk of harm. In January 2015, the Governor met with other government officials to discuss the ongoing threat to public health posed by legionella bacteria in the Flint River water. A couple of months later, the Governor and his staff discussed whether to distribute water filters to Flint residents as a form of mitigation against possible contamination. At the same time, the Governor's Chief of Staff informed the Governor that the water issue in Flint continued to be "a danger flag" and was something that needed addressing sooner rather than later. And in the summer, a senior member of the administration spoke with Governor Snyder about the fear that Flint's residents were being exposed to toxic levels of lead through the Flint River water. So when plaintiffs state that by February 2015, the Governor was fully aware of a public health threat posed by the water supply in Flint, and that by July 2015, at the very latest, the Governor knew that the water supply was contaminated, these conclusions are supported by well-pleaded factual allegations. It is reasonable to infer that Governor Snyder knew that the residents of Flint

faced a substantial risk of serious harm emanating from the water.

Third, plaintiffs plausibly state that the Governor acted indifferently to the risk of harm they faced, demonstrating a callous disregard for their right to bodily integrity. This indifference manifested itself in two ways. Initially, the Governor was indifferent because instead of mitigating the risk of harm caused by the contaminated water, he covered it up. In private, he worried about the need to return Flint to DWSD water and the political implications of the crisis. But in public, he denied all knowledge, despite being aware of the developing crisis. As a result, plaintiffs were lured into a false sense of security. They could have taken protective measures, if only they had known what the Governor knew. Instead, the Governor misled them into assuming that nothing was wrong. Governor Snyder's administration even encouraged them to continue to drink and bathe in the water.

Subsequently, the Governor continued to show indifference to the risk of harm plaintiffs faced. Even once he acknowledged the crisis, he downplayed the risks that plaintiffs faced. By October 2015, the Governor had publicly admitted that the water was contaminated and Flint had returned to DWSD water. Yet the Governor still waited many months to declare a state of emergency. This was despite local area leaders requesting such a declaration as far back as March 2015. Without a state of emergency, plaintiffs were denied valuable resources that could have helped abate the harm that they were still suffering. It is reasonable to infer that the rationale for the delay was in part because the Governor wanted to act as if the issue was resolved. But by downplaying the continuing risk of harm, the Governor undermined efforts to enact protective measures. And as with his initial form of indifference, this led to plaintiffs involuntarily ingesting lead and other contaminants, violating their bodily integrity.

These two ways of showing indifference represent a continuum of actions, more powerful combined than when viewed in isolation. They depict indifference in the form of deception, from the Governor's unwillingness to admit the crisis, to his downplaying of its severity once it became public knowledge. Viewed as a whole, the allegations plausibly describe "conscience shocking" conduct. Governor Snyder's actions were deliberately indifference and exhibited a callous disregard for plaintiffs' right to bodily integrity.

*Id.* at *70–74 (footnote omitted) (citations omitted). In this case, the proposed amended master complaint contains substantively the same, if not identical, allegations with respect to Governor Snyder and plaintiffs' right to bodily integrity as those contained in the fourth amended class complaint in *Carthan*. Therefore, what was true in *Carthan* remains true here: plaintiffs state a plausible bodily integrity claim against Governor Snyder. Granting leave to amend the master complaint to include it would not be futile and so leave is granted.

*Daniel Wyant*. Plaintiffs do not plead a plausible bodily integrity claim against defendant Wyant. As in *Carthan*, plaintiffs

[Do] not state a claim against Wyant because the allegations do not demonstrate deliberate indifference. Wyant was likely aware of the health risks posed by using the Flint River as a water source. There is also some indication that he knew the FWTP was not utilizing the proper corrosion control techniques and that Flint's water was contaminated. However, the fourth amended complaint contains nothing to suggest that Wyant either publicly denied there was a

48

problem with Flint's water, or that he otherwise encouraged Flint residents to use the contaminated water. Plaintiffs therefore do not plead that Wyant was deliberately indifferent.

*Id.* at *115–16. The proposed amended master complaint contains substantively the same allegations with respect to defendant Wyant as the fourth amended class complaint. (Dkt. 185-1 at 15 n.3.) However, plaintiffs argue that unlike the class complaint, their master complaint alleges that Wyant took an affirmative role in approving Flint's decision to join the KWA. (*Id.*) Be that as it may, this additional allegation standing alone does not demonstrate deliberate indifference. It does not show that Wyant either encouraged the residents of Flint to use the Flint River water or that he attempted to deceive them about the risks it posed. It only demonstrates that he had a hand in the creation of the Crisis, not that he was deliberately indifferent to its harmful impact on Flint's residents. As such, plaintiffs fail to state a plausible bodily integrity claim against Wyant. Granting leave to amend the master complaint to include it would therefore be futile. Leave to amend in this respect is denied.

*Adam Rosenthal, Patrick Cook, and Michael Prysby*. Plaintiffs plead a plausible bodily integrity claim against defendants Rosenthal, Cook, and Prysby. In *Carthan*, the Court explained that:

> Plaintiffs . . . state a claim against . . . Rosenthal, . . . Cook, and Prysby. It is reasonable to assume that they were aware of the substantial risk of harm plaintiffs faced[.] Rosenthal, and Prysby recognized that the FWTP was not ready to begin operations [when the decision was made to begin distributing Flint River water]. After the transition, Rosenthal learned that the FWTP was not practicing corrosion control, and he . . . knew that no legitimate lead and copper testing was occurring. Moreover, . . . Prysby also knew that the transition had created the conditions for legionella bacteria to flourish. Not to mention the fact that the EPA and civic leaders were raising concerns about the quality of Flint's water.

> Yet despite knowing of these serious risks, these defendants were indifferent to them[.] Cook signed the final permit necessary for the FWTP to begin operations[.] Furthermore, these defendants took steps to deceive Flint's residents into continuing to drink and bathe in the contaminated water[.] Cook misled the EPA by falsely suggesting that the proper corrosion control was in use at the FWTP; and . . . Rosenthal[] and Prysby directly or indirectly altered reports to remove results showing high lead concentrations in Flint's water. These actions exhibited a callous disregard for plaintiffs' right to bodily integrity.

2019 U.S. Dist. LEXIS 55607, at *114–15 (footnoted omitted). As with Governor Snyder and Wyant, the proposed amended master complaint contains substantively the same allegations as *Carthan*'s fourth

50

amended class complaint with respect plaintiffs' bodily integrity claim against Rosenthal, Cook, and Prysby. For the same reasons as set forth in *Carthan*, it would not be futile to grant leave to amend to include these allegations. Leave to amend is therefore granted.[14]

*Michael Glasgow, Daugherty Johnson, and Howard Croft.* Plaintiffs plead a plausible bodily integrity claim against defendants Glasgow, Johnson, and Croft. As explained in *Carthan*:

> [I]t is reasonable to conclude that these defendants were aware of the substantial risk of harm facing plaintiffs. As the transition to the Flint River loomed, all three knew that the FWTP was not ready to process the raw water. And Croft, in particular, was aware of the lead and Legionnaires' disease issues that followed the transition. Glasgow tested for and found high concentrations of lead in the water. He also recognized that Flint was not using corrosion control treatment and had no legitimate lead and copper testing in place. Moreover, these defendants acted with a callous disregard for plaintiffs' right to bodily integrity. Despite knowing that the FWTP was not ready to process the Flint River water, Croft and Johnson pressured Glasgow to give the green light to the transition. Johnson later blocked the Genesee County Health Department from scrutinizing Flint's water testing process. And Glasgow altered reports to hide

---

[14] Defendant Cook argues that plaintiffs' factual allegations are false, thereby rendering the Court's decision in *Carthan* erroneous. (Dkt. 203 at 29.) Specifically, he denies ever having misled the EPA about Flint's use of corrosion control. (*Id.*) Other defendants have also challenged the truth of the factual allegations contained in the proposed amended master complaint. (Dkt. 212). But the veracity of plaintiffs' allegations cannot be considered at this stage in the proceedings. The Court must view plaintiffs' well-pled allegations as true. *Keys*, 684 F.3d at 608.

high lead concentrations in Flint's water. Croft, Glasgow, and Johnson were thus deliberately indifferent by deceiving plaintiffs into thinking that there was no problem with Flint's water.

*Id.*, at *117–18. Once again, the proposed amended master complaint contains essentially the same allegations as *Carthan*'s fourth amended class complaint with respect to plaintiffs' bodily integrity claims against Glasgow, Johnson, and Croft. Granting leave to amend the complaint to include plaintiffs' revised bodily integrity claims against these defendants would not be futile and the Court grants leave to do so.

*Qualified Immunity.* Defendants Governor Snyder, Rosenthal, Cook, Prysby, Glasgow, Johnson, and Croft claim that they should be granted qualified immunity regardless of whether plaintiffs have stated a valid bodily integrity claim against them. (Dkt. 204 at 37–39; Dkt. 203 at 25–29; Dkt. 137 at 66–68.) And because in their view, qualified immunity bars plaintiffs' bodily integrity claim, granting leave to amend to include it would be futile. It is true that

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides protection to government officials who make reasonable yet mistaken decisions that involve open questions of law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). But an official cannot avail herself of qualified immunity if

the right violated was "clearly established at the time of the challenged conduct." *Guertin*, 912 F.3d at 917 (quoting *al-Kidd*, 563 U.S. at 741–42). If controlling caselaw or a body of persuasive authority has put the constitutional question beyond debate, government officials are on notice that their conduct must conform to an established legal standard. *Id.* at 932.

*Carthan*, 2019 U.S. Dist. LEXIS 55607, at *74–75. But it is also true that

> [T]he right to bodily integrity was clearly established at the time of the challenged conduct. [*Guertin*, 912 F.3d] at 932–35. "Knowing the Flint River water was unsafe for public use," failing to take "steps to counter its problems, and assuring the public in the meantime that it was safe" was "conduct that would alert a reasonable person to the likelihood of personal liability." *Id.* at 933 (quoting *Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003)). In other words, any reasonable official should have known that "contaminat[ing] a community through its public water supply with deliberate indifference is a government invasion of the highest magnitude." *Id.*

*Id.* at *75. As a result, these defendants cannot avail themselves of qualified immunity under these circumstances.

*

In sum, the Court grants plaintiffs leave to amend the master complaint to include the revised bodily integrity claims against defendants Governor Snyder, Rosenthal, Cook, Prysby, Glasgow, Johnson, and Croft. But it denies plaintiffs leave to amend the complaint to include this revised claim against defendant Wyant.

### c. Equal Protection

Plaintiffs seek leave to revise their equal protection claims. In the operative master complaint, plaintiffs pleaded two equal protection counts, one alleging discrimination on the basis of race and the other on wealth. (Dkt. 115 at 94–101.) The proposed amended master complaint retains this basic structure (Dkt. 185-2 at 172–80) but makes two important changes. These changes are the same as those offered by the putative class plaintiffs in *Carthan*. (Dkt. 185-1 at 23.) There, the claims were described as follows:

> First, only those plaintiffs who are African American allege race discrimination. Second, both counts are broken into three theories of liability: (1) . . . defendants Snyder, Dillon, Wright, Ambrose . . . and Earley violated their right to equal protection by providing Flint with contaminated water while supplying the remainder of Genesee County with clean water; (2) Governor Snyder violated their right to equal protection by delaying his decision to declare a state of emergency in Flint while promptly doing so in other emergency situations; and (3) MDEQ defendants Wyant, . . . Prysby, and Busch violated their right to equal protection by not enforcing certain laws and regulations in Flint.[15]

---

[15] In the proposed amended master complaint, plaintiffs mention defendant Walling in some of their equal protection allegations. (Dkt. 185-2 at 172, 176.) Yet Walling is omitted from the list of defendants named in the equal protection counts. (*Id.* at 172–75.) The class complaint did the same in *Carthan*. 2019 U.S. Dist. LEXIS 55607, at *76 n.9. There, the Court assumed that the plaintiffs intended to omit Walling from the equal protection counts. *Id.* For the sake of consistency, here, the Court does the same.

*Carthan*, 2019 U.S. Dist. LEXIS 55607, at *76 (footnote omitted) (citations omitted). Next, the Court set forth the applicable equal protection principles:

> The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws[.]'" *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Broadly speaking, it requires that state officials treat all persons alike, under like circumstances and like conditions. *Cleburne*, 473 U.S. at 439; *see also Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 682 (6th Cir. 2011). When officials treat similar individuals differently, the Equal Protection Clause demands a justification. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008). But because all state action tends to disfavor some more than others, courts take this practical reality into account by evaluating state action under differing levels of scrutiny. *See Breck v. Michigan*, 203 F.3d 392, 395 (6th Cir. 2000). If official conduct "neither burdens a fundamental right nor targets a suspect class," courts will uphold it "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (citing *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).

*Id.* at *77. The Court will address plaintiffs' wealth and race-based claims in turn.

*Wealth-Based Discrimination*. Plaintiffs fail to state a valid equal protection claim based on wealth-based discrimination. In *Carthan*, the Court explained that

A class of less wealthy persons is not a protected class for the purposes of equal protection. *Molina-Crespo v. United States MSPB*, 547 F.3d 651, 660 (6th Cir. 2008). The challenged conduct will therefore be upheld if it satisfies a rational basis. *Romer*, 517 U.S. at 631.

Under rational basis review, official decisions are afforded a strong presumption of validity. *See Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001). And even at the motion to dismiss stage, this presents a formidable bar for plaintiffs to surmount. *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018). To plausibly allege that state action fails under rational basis review, plaintiffs must negate "every conceivable basis" which might support the challenged conduct. *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012). Courts do not consider the wisdom of the challenged action. *Theile*, 891 F.3d at 244 (citing *Breck*, 203 F.3d at 395). And defendants do not need to offer any justification. *Walker*, 257 F.3d at 668. It is enough that the reviewing court can fairly conceive of one existing. *Id.*

*Id.* at *77–78. Applying this legal framework to the revised allegations, the Court discussed the first two theories:

[P]laintiffs' first theory is that defendants Snyder, Dillon, Wright, Ambrose[,] . . . and Earley created an interim plan to supply Flint with Flint River water, while continuing to provide the remainder of Genesee County with DWSD water. In plaintiffs' view, there was no rational basis for this decision.

Even assuming that Flint and the remainder of Genesee County were similarly situated for equal protection purposes, there are many rational reasons that could justify providing only Flint with Flint River water. The KWA could not proceed without Flint's participation. Flint's participation was contingent on the FWTP's ability to process the raw water

that the KWA pipeline would provide, and upgrading the FWTP would cost millions. One key way defendants could accomplish this was to stop paying for the relatively expensive DWSD water and to start taking water from the Flint River. Indeed, even plaintiffs allege that this was a critical part of the interim plan.

In hindsight, this was a terrible decision. It placed financial interests above the health and safety of Flint's residents. Assuming the allegations are true, defendants harmed plaintiffs in the pursuit of fiscal expedience. But the Court cannot consider the wisdom of the decision. And it does not matter that defendants may have had other options available to them. It only matters that there is a rational basis for the decision. As such, plaintiffs' first theory fails to state a claim.

Plaintiffs' second theory fails for a similar reason. They draw a comparison between Flint and other communities with respect to emergencies across the state. Governor Snyder allegedly waited several months to declare a state of emergency in Flint from the date he publicly acknowledged the seriousness of the problem. With other disasters, he typically acted within days. Plaintiffs again argue that there was no rational basis for this difference in treatment.

Again, even assuming that Flint and these other disaster-struck communities were similarly situated for equal protection purposes, there is a conceivable rational basis for treating them differently. In part, plaintiffs were harmed by the Governor's delay in declaring a state of emergency because it limited their access to state resources to remedy the problem. It is thus conceivable that the Governor initially decided not to expend these resources, believing that the Flint Water Crisis could be addressed without them. In retrospect, this was objectively the wrong decision. And the Governor undoubtedly was within his authority to declare a state of emergency at an earlier time. But the Court cannot inquire

further under rational basis review. As a result, plaintiffs'
second theory also fails to state a claim.

*Id.* at *78–80. (citations omitted). Plaintiffs' third theory encountered a

different problem.

> Plaintiffs allege that the MDEQ defendants Wyant, . . .
> Prysby, and Busch treated them differently by:
>
>> (1) granting a fraudulent [ACO] to allow Flint to
>> borrow funds to participate in the KWA; (2)
>> issuing the [FWTP] a permit pursuant to the
>> Michigan Safe Drinking Water Act without
>> observing the statutorily mandated 45-day notice
>> and comment period; (3) failing to comply with
>> sampling and optimized corrosion control protocols
>> as required under the State and Federal Lead and
>> Copper Rule; and (4) lacking any
>> nondiscrimination policy for more than 30 years
>> and ignoring EPA requirements to update its
>> policy for years.
>
> However, they fail to explain how this treatment
> differed from that of a similarly situated class of persons.
>
> Class-based discrimination is the essence of an equal
> protection claim. *See Herron v. Harrison*, 203 F.3d 410, 417
> (6th Cir. 2000) (citing cases). In limited situations, a plaintiff
> does not need to identify a specific group of persons who were
> treated differently. For instance, if government conduct was
> premised on a protected classification such as race or gender,
> a showing of discriminatory purpose may suffice. *See, e.g.,
> Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.
> 252, 264–68 (1977) (explaining that a single act, if motivated
> by a desire to treat persons differently on the basis of race,
> can result in a violation of the Equal Protection Clause).
> However, outside of that narrow range of cases, plaintiffs

must plead sufficient facts from which it can be inferred that defendants treated similarly situated individuals differently. *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574–75 (6th Cir. 2008); *see also Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim.").

Here, plaintiffs highlight several instances in which defendants failed to enforce either a law or a policy, but the allegations do not explain in anything but conclusory terms how defendants acted differently in other situations. For example, to the extent that defendants failed to observe the statutory forty-five day notice and comment period before issuing the FWTP an operating permit, it may be that they normally dispensed with this requirement. Likewise, although plaintiffs plead that defendants did not comply with state and federal lead and copper testing requirements, the complaint reveals nothing about the possibility that defendants failed to enforce these laws on a statewide basis. Accordingly, plaintiffs' third and final theory also fails to state a claim.

*Id.* at *80–82 (citations omitted) (alterations in original). In this case, plaintiffs' wealth-based equal protection allegations are identical to those proposed by the plaintiffs in *Carthan*. Therefore, for the same reasons, granting leave to amend the proposed master complaint to include them would be futile and leave to do so is denied.

*Race-Based Discrimination.* Plaintiffs also fail to state a claim that defendants violated their right to equal protection on the basis of race discrimination. In *Carthan*, the Court addressed the same claim:

> When state action is premised on a racial classification, courts strictly scrutinize the challenged conduct. *Cleburne*, 473 U.S. at 440; *Mass. Bd. of Ret.*, 427 U.S. at 312; *see also United States v. Carolene Prod. Co.*, 304 U.S. 144, 152 n.4 (1938) (noting that courts act with greater vigilance when equal protection claims affect the politically powerless). Conduct subject to strict scrutiny is presumptively invalid; only official action that is narrowly tailored to meet a compelling state interest will survive. *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 276 F.3d 876, 879 (6th Cir. 2002).

> Yet "proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" on the basis of race discrimination. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Arlington Heights*, 429 U.S. at 265); *Washington v. Davis*, 426 U.S. 229, 239–41 (1976)). If discriminatory intent is missing, claims are analyzed under rational basis. *See Radvansky*, 395 F.3d at 312. And the facts must offer more than "intent as volition or intent as awareness of consequences." *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). Rather, they must demonstrate that a decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon a particular racial group." *Id.*; *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *King v. City of Eastpointe*, 86 F. App'x 790, 802 (6th Cir. 2003)).

> At this stage in the case, plaintiffs need only raise an inference of discriminatory purpose. To do so, they must demonstrate that the application of a facially neutral law or

policy had a discriminatory impact, and sufficient evidence exists to suggest an invidious motive. *Arlington Heights*, 429 U.S. at 265–66; *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636–37 (6th Cir. 2016). The challenged conduct does not need to rest "solely on racially discriminatory purposes," but this must have been a "motivating factor." *Arlington Heights*, 429 U.S. at 265. And although discriminatory impact is an important starting point, it is rarely enough on its own. *Id.* Instead, courts must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Discriminatory impact alone is only sufficient in the rarest case where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Id.* at 266 (citations omitted).

Several non-exhaustive factors guide this inquiry: (1) "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267; (2) "the specific sequence of events leading up to the challenged decision . . . may shed . . . light on the decisionmaker's purposes," *id.*; (3) "[d]epartures from the normal procedural sequence . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," *id.*; and (4) "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *id.* at 268.

*Id.* at *83–85 (alterations in original) (footnotes omitted). Applying these principles to the factual allegations, the Court denied the *Carthan* plaintiffs leave to amend the complaint to include their race-based equal protection claim:

As a starting point, plaintiffs plead discriminatory impact for all three theories. Under each theory, they allege that defendants' conduct negatively impacted Flint. And Flint is majority African American. However, this is not the "rarest case" where the discriminatory impact is so stark as to immediately warrant an inference of discriminatory purpose. *See Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (invalidating state action where redrawing of city boundaries disenfranchised all but four or five of the municipality's 400 African American voters); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (finding a violation of equal protection where an ordinance was exclusively applied against Chinese-owned laundries). After all, Flint is 40.4% white.

Plaintiffs also point to the historical background for all three theories. They identify a long history of race discrimination and segregation and argue that this should factor into the Court's analysis. But plaintiffs do not connect Flint's history of systemic racism to defendants' conduct. They imply that the legacy effects of historical racism should be imputed to defendants because they were state actors carrying out official business. But this alone is not enough to warrant an inference of discriminatory purpose. It will be considered with the other evidence.

Plaintiffs' first theory, the decision to switch Flint's water supply to the Flint River while providing DWSD water to the remainder of Genesee County, lacks sufficient facts to warrant an inference of discriminatory purpose. Little about the sequence of events indicates that a racial bias was driving defendants. In the months leading up to the switch, cost studies suggested that DWSD water was the more economic mid-term option. But the KWA would only be viable if the Flint River was used as an interim water source. And defendants were concerned that DWSD water would become increasingly expensive.

Likewise, defendants' contemporary statements do not change the outcome. Defendant Wright expressed the view that DWSD is a corrupt entity. But this does not indicate racial animus and the fourth amended complaint offers nothing further. Therefore, when all the facts are taken into consideration, the allegations fail to show that race motivated defendants' decision. At most they show that defendants acted in spite of the risk of harm that plaintiffs faced, not that they were driven by it. Plaintiffs' first theory thus fails to state a claim.

With their second theory that the Governor treated the emergency situation in Flint differently, plaintiffs also fail to allege sufficient facts to warrant an inference of discriminatory purpose. Governor Snyder allegedly knew that Flint's water supply was contaminated months before publicly acknowledging it, but he did not alert the public until October 2015, when it was impossible to deny. The Governor also took many months more to declare a state of emergency. And presumably the conditions that gave rise to the eventual emergency declaration existed the whole time. Similarly, a departure from past practice works in plaintiffs' favor. Governor Snyder's conduct in Flint differed from that in some majority white communities, where he promptly issued states of emergency.

Nonetheless, these facts taken as a whole do not support an inference of discriminatory intent. The comparative states of emergency identified in the fourth amended complaint involved drastically different situations, such as several wildfires and floods, meaning plaintiffs' comparison is less apples-to-apples than it initially appears. And in the one instance where plaintiffs cite to an emergency involving water contamination, they identify an incident that occurred several years after the facts pertinent to this present case. Accordingly, it is hard to know whether the Governor's prompt response was a reaction to the criticism about his handling of Flint, rather than evidence of a desire to harm

African Americans. Moreover, plaintiffs do not point to a clear pattern of discrimination where Governor Snyder consistently delayed declaring states of emergency in mostly African American areas. In fact, a close inspection of the analogous emergencies suggests the opposite was almost true. During a flood in Wayne County, which is 45.4% non-white, the Governor declared an emergency within two days. The departure from practice is less salient.

Plaintiffs point to no other facts sufficient to support a finding of discriminatory purpose. During the crisis, a senior member of the Governor's administration dismissed complaints from Flint activists as the product of "old time negative racial experiences." But even if the same thoughts are attributed to Governor Snyder, it only shows that he acted in spite of the fact that Flint was majority African American, not because of this fact. When the allegations are collectively considered, they do not warrant an inference of invidious intent. And as such, plaintiffs' second theory fails to state a claim.

Finally, plaintiffs' third theory that the MDEQ defendants failed to enforce certain laws and policies also fails to allege sufficient facts to warrant an inference of discriminatory purpose. As discussed above, plaintiffs generally point to Flint's history of racial discrimination, and this alone is insufficient to show invidious intent. However, here, plaintiffs also note that the EPA had concluded earlier that the MDEQ had discriminated against Flint's African Americans when issuing an operating permit for a local power station. In particular, the EPA found that the MDEQ did not have a sufficient non-discrimination policy in place. And this lack of policy persisted during the Flint Water Crisis. As recently as 2017, the EPA was still raising concerns that the MDEQ did not take its non-discrimination obligations seriously.

However, the MDEQ's failure to develop a sufficient nondiscrimination policy does not demonstrate discriminatory intent. Plaintiffs do not allege that . . . Prysby, and Busch were responsible for the MDEQ's internal policies. Nor is there any sign that they obstructed or otherwise hindered the development of other procedural safeguards. Defendant Wyant, as MDEQ director, was presumably ultimately responsible for the non-discrimination policy, but plaintiffs do not plead facts that suggest his failure to develop such a policy was motivated by a nefarious purpose.

Neither the specific sequence of events nor any departure from standard procedures suggest a race-based motive. Defendant[] . . . Busch [was] allegedly involved in helping Flint secure a fraudulent ACO. Yet there is no suggestion that a desire to harm African Americans motivated [his] conduct. The same is true of the decision to grant the FWTP an operating permit without sufficient public participation, and the MDEQ's failure to enforce lead and copper testing requirements. The allegations do not provide any way to link these decisions to a discriminatory intent. Plaintiffs allege that these types of nonconformities with law and policy never occurred in majority white communities, but these are conclusory accusations. These defendants also made no contemporary statements indicating that race motivated their actions. And there is nothing else to connect their conduct to a discriminatory purpose. As such, when the facts are considered together, plaintiffs' third theory fails to state a claim.

*Id.* at *85–91 (footnotes omitted) (citations omitted). In this case, plaintiffs include similar factual allegations in support of their race-based equal protection claim. The question is therefore whether they have included sufficient additional allegations to require the Court to

render a different decision. The answer is no. Although some paragraphs in the proposed master complaint add additional factual matter, taken as a whole they are substantively identical to the class allegations discussed in *Carthan*. They describe a situation where defendants acted in spite of the harm caused to African Americans. They do not adequately plead that defendants conduct was motivated by that desire. For this reason, plaintiffs fail to state a race-based equal protection claim. And accordingly, granting leave to amend the complaint to included it would be futile. The Court therefore denies leave to do so.[16]

### d. Elliott-Larsen Civil Rights Act

Plaintiffs seek leave to amend the complaint to include a revised ELCRA claim against defendants Snyder, Dillon, Wright, Ambrose, Earley, the City of Flint, Wyant, Prysby, and Busch. (Dkt 185-2 at 185–90.) The proposed ELCRA claim mirrors their equal protection claims in that plaintiffs advance similar theories of liability: that (1) defendants Snyder, Dillon, Wright, Ambrose, and Earley provided Flint's

---

[16] The MDEQ defendants argue that plaintiffs should be denied leave to amend the complaint with respect to their revised equal protection claims because these claims would be barred by the statute of limitations. (Dkt. 203 at 6–9.) Because the Court denies plaintiffs leave to amend, this argument is not addressed.

predominantly African American residents with inferior water when compared to the mostly white residents of Genesee County (*id.* at 185–88); (2) Governor Snyder failed to promptly declare a state of emergency in Flint compared to other emergencies in predominantly white communities, (*id.* at 188); and (3) the MDEQ defendants Wyant, Prysby, and Busch failed to enforce certain laws and regulations. (*Id.* at 188–89.)[17]

In *Carthan*, the Court faced near identical allegations, and it denied the plaintiffs, there, leave to amend for the following reasons:

> The ELCRA "is aimed at 'the prejudices and biases' borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Radtke v. Everett*, 442 Mich. 368, 379 (1993) (quoting *Miller v. C.A. Muer Corp.*, 420 Mich. 355, 363 (1984)). To state a claim under Article 3, plaintiffs must allege: "(1) discrimination based on a protected characteristic (2) by a person, (3) resulting in denial of the full and equal enjoyment of [a public service]." *See Haynes v. Neshewat*, 477 Mich. 29, 35 (2007); *Clarke v. K-Mart Corp.*, 197 Mich. App. 541, 545 (1992). The ELCRA defines public service as "a public facility . . . owned, operated, or managed by or on behalf of . . . a political subdivision . . . established to provide service to the public." § 37.2301. For

---

[17] As with the revised equal protection claims, plaintiffs include defendant Walling in their ELCRA allegations. (Dkt. 185-2 at 185.) Yet Walling is omitted from the list of defendants named in the ELCRA count. As with the revised equal protection claims, the Court assumes that plaintiffs intended to omit Walling.

the purposes of this analysis, the Court assumes that Flint's municipal water supply is a public service under the ELCRA.

The public service provision of the ELCRA uses the same framework to establish discrimination as that used generally under other provisions of the ELCRA. *See Schellenberg v. Rochester Lodge No. 2225 of the Benevolent & Protective Order of Elks*, 228 Mich. App. 20, 32 (1998); *Clarke*, 197 Mich. App. at 545. Plaintiffs must show either intentional discrimination directly or raise an inference of discrimination based on a disparate treatment theory. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462–63 (2001); *Clarke*, 197 Mich. App. at 545. In a case like this involving allegations of race-based discrimination, plaintiffs can plead intentional discrimination by pointing to direct evidence that defendants were predisposed to discriminate against African Americans, and that they acted on that pre-disposition. *See Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 538 (1991). Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in [defendants'] actions." *Hazle*, 464 Mich. at 462 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Alternatively, plaintiffs can raise an inference of discrimination by pleading that defendants treated them differently from non-protected individuals under the same or similar circumstances. *See Reisman*, 188 Mich. App. at 538 (citing *Singal v. Gen. Motors Corp.*, 179 Mich. App. 497, 502–03 (1989)); *Schellenberg*, 228 Mich. App. at 33. But here, they must also point to sufficient indirect evidence from which it can be inferred that race was a motivating factor, even if not "the sole factor." *See Reisman*, 188 Mich. App. at 539; *see also* Mich. M Civ JI 108.04 (2018) (identifying intentional discrimination as an element in an Article 3 ECLRA claim).

It is unclear whether plaintiffs are relying on direct evidence or evidence of disparate treatment to prove this claim. Plaintiffs do not offer direct evidence to show

defendants were predisposed to discriminate on the basis of race, nor that they acted on that predisposition. However, they have pleaded facts consistent with a disparate treatment theory and so the Court proceeds on this basis.

Under a disparate treatment approach, plaintiffs fail to plead sufficient facts to raise an inference of racial discrimination. This is for the same reasons as set forth above with respect to plaintiffs' equal protection claims. Plaintiffs have not explained why their ELCRA claim should be evaluated under a different standard. Therefore, plaintiffs' ELCRA claim could not survive a motion to dismiss, and so granting leave to amend the complaint to include it would be futile.

2019 U.S. Dist. LEXIS 55607, at *93–95 (alternations in original) (citations omitted). The same is true in this case. If leave were granted to amend the complaint to include plaintiffs' ELCRA claim, it could not withstand a motion to dismiss because plaintiffs have provided insufficient factual allegations to warrant an inference of discriminatory intent. This is for the same reasons as set forth above in the Court's equal protection analysis. *See supra* Section II.C.ii.c. In addition, plaintiffs have not pleaded facts demonstrating direct evidence of racial discrimination. For these reasons, leave to amend to include plaintiffs' revised ELCRA claim is denied.[18]

---

[18] As with plaintiffs' revised equal protection claims, several defendants argue that plaintiffs should be denied leave to amend the complaint with respect to their

### e. Conspiracy

Plaintiffs next seek leave to amend the master complaint to revise their 42 U.S.C. § 1985(3) conspiracy claim.[19] (Dkt. 185-2 at 180–85.) In the operative master complaint, plaintiffs pleaded their conspiracy claim against defendants Snyder, Dillon, Wright, Walling, Ambrose, Kurtz, and Earley. The revised claim included in the proposed amended master complaint omits Kurtz and Walling.[20] (Dkt. 186-1 at 183). Additionally, plaintiffs now allege that defendants violated their rights secured under § 1985(3) in the following two ways, both of which are familiar: (1) defendants Snyder, Dillon, Wright, Ambrose, and Earley provided Flint's predominantly African American residents with inferior water when

---

revised ELCRA claim because it would be barred by the statute of limitations. (Dkt. 203 at 6–9; Dkt. 205 at 26–28.) Because the Court denies plaintiffs leave to amend, there is no reason to reach this issue.

[19] In pertinent part, § 1985(3) states: "If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . [and] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

[20] As with the revised equal protection and ELCRA claims, plaintiffs omit Walling from the initial list of defendants, but they include him in the allegations that follow. Consistent with its approach to the revised equal protection and ELCRA claims, the Court assumes that plaintiffs intended to omit Walling and Kurtz.

compared to the mostly white residents of Genesee County (*id.* at 180–83.); and (2) Governor Snyder failed to promptly declare a state of emergency in Flint compared to other emergencies in predominantly white communities, (*id.* at 183).[21] For the reasons set forth below, the Court denies plaintiffs leave to amend the complaint to include this revised claim.

Under plaintiffs' first theory, the Court addressed the identical claim in *Carthan*. There, it stated that

> In the context of § 1985(3), plaintiffs shoulder a heavy pleading burden. "Conspiracy claims must be pled with some degree of specificity[.]" *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987). "[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim[.]" *Id.* To state a claim under § 1985(3), plaintiffs must plead facts consistent with (1) a conspiracy between two or more persons, (2) conceived for the purpose of depriving a person or class of people of the equal protection of the laws, (3) an act committed in furtherance of the conspiracy, and (4) that a person was either injured in his or her person or property, or deprived of a right guaranteed by the Constitution. *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) (citing *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)). In so doing, plaintiffs must demonstrate that the conspiracy was motivated by racial or

---

[21] Plaintiffs also allege that the MDEQ defendants Wyant, Shekter-Smith, Prysby, and Busch violated their rights secured under § 1985(3) by failing to enforce certain laws and regulations. (*Id.* at 183–84.) However, these defendants are not named in the count. (*Id.* at 180.) The Court again assumes that plaintiffs intended to omit these defendants.

other constitutionally suspect class-based animus. *Bartell v. Lohiser*, 215 F.3d 550, 559–60 (6th Cir. 2000) (citing *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983)).

Pleading invidious class-based animus is important. Section 1985(3) is not a "general federal tort law," providing a federal cause of action for every assault and battery. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 299 (1993) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). The intent requirement ensures that only those conspiracies that "aim at a deprivation of the equal enjoyment of rights secured by the law to all" are actionable under the statute. *Griffin*, 403 U.S. at 102.

*Carthan*, 2019 U.S. Dist. LEXIS 55607, at *96–97 (alterations in original) (footnote omitted). The Court went on to deny the *Carthan* plaintiffs' claim, explaining:

Plaintiffs fail to plausibly allege that defendants were motivated by racial or any other invidious class-based animus. Plaintiffs possibly show that the impact of historical race discrimination played a role in the Flint Water Crisis, but not that it was a motivating factor. For example, plaintiffs repeatedly assert that the interim plan provided safe water to predominantly white Genesee County residents and unsafe water to the mostly African American Flint residents. But this only demonstrates a disparate impact resulting from defendants' decisions. It does not show that they were motivated by the kind of discriminatory animus necessary to state a § 1985(3) claim. Similarly, plaintiffs contend that early complaints from Flint residents would have been taken into account faster had they been affluent and predominantly white. This allegation suffers from the same flaw.

Many of the facts contained in the fourth amended complaint set forth the historic impact of racism in Flint, but not specific instances of racially motivated conduct by the defendants. This history is important to understanding patterns of segregation, poverty, and other conditions that may have left plaintiffs vulnerable to the Flint Water Crisis. Yet such theories do not show invidious class-based animus by the named defendants.

*Id.* at *97–98. Here, plaintiffs' revised conspiracy claim based on their first theory suffers from the same shortcoming. The proposed amended master complaint contains substantively the same allegations as the fourth amended class complaint in *Carthan*. And plaintiffs therefore do not provide sufficient facts from which it is plausible to infer a discriminatory motivation.

Under plaintiffs' second theory involving Governor Snyder's delayed decision to declare a state of emergency, plaintiffs fail to demonstrate that he acted with a discriminatory motive when he delayed declaring a state of emergency. Plaintiffs argue that there was no rational basis for the Governor's decision, so race must have been the motivating factor. (Dkt. 185 at 167.) But the allegations describe a different situation, one where the Governor was apathetic to the harm faced by Flint's residents and more concerned with denying the

magnitude of the crisis in the hopes that it would fade away than tackling it head on and assuming responsibility.

As such, plaintiffs are denied leave to amend the complaint to include their revised § 1985(3) claim. Because plaintiffs fail to allege discriminatory motive under either of the theories they present, the claim could not withstand a motion to dismiss and granting leave to include it would be futile. The Court therefore denies leave to do so.

### f. Gross Negligence

Plaintiffs seek leave to amend the master complaint to include a revised gross negligence claim. (Dkt. 185-2 at 190–93.) Plaintiffs look to bring this claim against the government defendants Snyder, Dillon, Lyon, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Earley, Ambrose, Croft, Johnson, and Glasgow. (*Id.* at 190.) This is in contrast to the operative master complaint, where a gross negligence claim is brought against all defendants. (Dkt. 186-1 at 199.) Aside from that, the allegations are the same. Plaintiffs argue not only that these defendants were grossly negligent and that their conduct caused plaintiffs' injuries, but in addition that these defendants cannot claim immunity under Michigan's Government Tort Liability Act (GTLA), Mich. Comp. Laws. §§

691.1401–19 (2014). (Dkt. 185-1 at 27–30.) However, for the following reasons the Court denies plaintiffs leave to include this revised claim.

The Court explained the principles behind the GTLA in *Carthan*:

> The GTLA premises immunity on various theories. Pertinently, "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her . . . executive authority." § 691.1407(5). Under this theory, defendants Snyder, Dillon, and Lyon are absolutely immune. *See Guertin*, 2017 U.S. Dist. LEXIS 85544, at *77–78. The same is true of defendants Kurtz, Earley, Ambrose, and Croft, and defendants Shekter-Smith and Wurfel. *See id.*

> This leaves the remaining defendants, lower-level government employees. Lower-level employees are "immune from tort liability for an injury to a person or damage to property caused by the . . . employee . . . while in the course of employment" if the employee is "acting or reasonably believes he or she is acting within the scope of his or her authority," unless the employees' conduct amounts to "gross negligence that is the proximate cause of the injury or damage." § 691.1407(2)(a)–(c). To identify whether a lower-level employee was the proximate cause of an injury, courts must first evaluate "the conduct and any legal responsibility" of the various parties to an accident, *Ray v. Swager*, 501 Mich. 52, 74 (2017), where legal responsibility is assessed by determining whether the accident was a foreseeable consequence of an individual's actions, *see id.* at 69. And second, courts must jointly consider the actions of those legally responsible to determine whose conduct was the "one most immediate, efficient, and direct cause" of any injury. *Id.* at 83 (quoting *Robinson v. City of Detroit*, 462 Mich. 439, 462, (2000)). If the answer is anyone but the employee, the employee can claim immunity.

2019 U.S. Dist. LEXIS 55607, at *99–100. With respect to defendants Snyder, Dillon, Lyon, Earley, Ambrose, Croft, and Wurfel, the Court again holds that these defendants are immune from tort liability under the GTLA. As for the remaining defendants, plaintiffs argue that "[e]ach defendant took actions for which the alleged harms were sufficiently alleged to be foreseeable." (Dkt. 185-1 at 30.) From this, they conclude that *Ray*'s test is satisfied and that therefore the remaining defendants cannot claim immunity.

This is exactly the same argument that the Court considered and rejected in *Carthan*. There, the Court explained:

> The fourth amended complaint states that defendants' conduct was a direct and proximate cause of plaintiffs' injuries, but fails to explain, first, why they were legally responsible for this harm in anything but conclusory terms, and second, why such conduct was the "one most immediate, efficient, and direct cause" preceding plaintiffs' injuries. Instead, plaintiffs argue that they need only demonstrate that "it was foreseeable that the defendant's conduct could result in harm to the victim." But this is a misinterpretation of *Ray*, a case this Court is bound to follow. And because plaintiffs ask the Court to do something it cannot, amending the fourth amended complaint to include this claim would be futile.

2019 U.S. Dist. LEXIS 55607, at *100–01 (citations omitted). For the same reasons, plaintiffs' claim against the remaining government

defendants is futile. Assuming that all these defendants proximately caused plaintiffs' injuries, the proposed amended master complaint fails to identify which one of them was the "most, immediate, efficient, and direct [proximate] cause." *Ray* clearly requires a plaintiff to identify which defendant is most legally responsible for an injury. Plaintiffs have mistakenly argued that *Ray* is satisfied if a plaintiff shows that a defendant is legally responsible in general. Leave to amend to include this count is therefore denied.

### g. Professional Negligence

Finally, plaintiffs seek leave to amend the complaint to bolster allegations of professional negligence against defendant Rowe. (Dkt. 185-1 at 30–31.) Rowe has not opposed the addition of these new allegations. The Court finds no reason to deny leave to amend to include them. Leave to amend is therefore granted.

### D.    Conclusion

Plaintiffs' motion for leave to amend the complaint regarding the revised bodily integrity claims against defendants Governor Snyder, Rosenthal, Cook, Prysby, Glasgow, Johnson, and Croft is granted, and plaintiffs' motion regarding the remaining claims is denied, including all claims against defendant Shekter-Smith. Additionally, the Court finds

no reason to deny leave to amend to include the new factual allegations contained within the proposed amended master complaint. Plaintiffs' motion as it relates to these allegations is therefore also granted.

## III. Motions to Dismiss in *Walters v. Flint*, No. 17-cv-10164

For the purpose of adjudicating defendants' motions to dismiss in *Walters*, the Court adopts the proposed amended master complaint (Dkt. 185-2) as the operative master complaint, and plaintiffs' proposed amended short form complaint (Dkt. 192-1) as the operative short-form complaint. If the Court denied leave to include a particular claim in Part II, that claim will be dismissed with no further discussion.

### A. Background

The facts and parties remain unchanged from those set forth above in Part II. The amended short-form complaint contains the following counts:

| Count | Claim | Defendants |
|-------|-------|------------|
| I | State-Created Danger | All government defendants |
| II | Bodily Integrity | All government defendants |
| III–IV | Equal Protection | Snyder, Dillon, Wright, Ambrose, Earley, Wyant, Prysby, and Busch |
| V | Conspiracy | Snyder, Dillon, Wright, Ambrose, and Earley |
| VI | ELCRA | Snyder, Dillon, Wright, Ambrose, Earley, the City of Flint, Wyant, Prysby, and Busch |

| VII | Gross Negligence | Snyder, Dillon, Lyon, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Earley, Ambrose, Croft, Johnson, and Glasgow |
|---|---|---|
| VIII | Punitive Damages | All defendants |
| IX–XI | Professional Negligence | LAN, Rowe, and Veolia |

This table does not include the counts pleaded against defendant Liane Shekter-Smith. For the reasons stated in Section II.C.ii.a., the claims against Shekter-Smith are dismissed.

## B.   Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. When ruling on a Rule 12(b)(1) motion "the court must take the material allegations of the [complaint] as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974)). Plaintiffs need "only show that the complaint alleges a claim under federal law, and that the claim is 'substantial.'" *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996) (quoting *Transcon. Leasing, Inc. v. Mich. Nat'l Bank*, 738 F.2d 163, 165 (6th Cir.1984)). This is a relatively light burden. *See id.* "Dismissal for lack of subject-matter jurisdiction . . . is proper only when the claim is 'so insubstantial,

implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)).

A motion that challenges the legal sufficiency of a complaint is instead properly brought under Federal Rule of Civil Procedure 12(b)(6). *See supra* Section II.B.

## C.    Threshold Issues

### i.    Sovereign Immunity

Defendants Governor Snyder and the City of Flint move to dismiss on the basis of sovereign immunity.[22] First, Governor Snyder argues that sovereign immunity deprives the Court of jurisdiction to hear plaintiffs' claims against him in his official capacity for injunctive relief.[23] (Dkt. 143

---

[22] As a challenge to the Court's subject matter jurisdiction, Governor Snyder and the City of Flint's motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(1). However, in all other respects, defendants' motions to dismiss are brought pursuant to Rule 12(b)(6).

[23] Governor Snyder also argues that the Court lacks jurisdiction to hear plaintiffs' claims against him in his official capacity for monetary relief. (Dkt. 204 at 31–32.) However, plaintiffs bring no such claim. Additionally, the state defendants suggest that sovereign immunity deprives the Court of jurisdiction to hear plaintiffs' claims against defendants Snyder, Lyon, and Dillon in their individual capacities.

at 37–43; Dkt. 204 at 32–37.) For the reasons outlined in *Carthan*, however, the Court has jurisdiction to hear these claims:

> In *Boler*, the Sixth Circuit explained that there are three exceptions to sovereign immunity, the relevant one here being "when the doctrine set forth in *Ex Parte Young* applies." 865 F.3d at 410 (citations omitted). "*Ex Parte Young* allows plaintiffs to bring claims for prospective [injunctive] relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Id.* at 412. In this case, plaintiffs only seek injunctive relief against Governor Snyder in his official capacity.
>
> *Boler* is a Sixth Circuit decision that forms part of the Flint Water Cases litigation. It held that the *Ex Parte Young* exception applied to the injunctive relief sought by the plaintiffs against Governor Snyder in his official capacity. There, the plaintiffs sought an "injunctive order to remediate the harm caused by Defendants' unconstitutional conduct including, but not limited to: repairs of private property and establishment of medical monitoring to provide healthcare and other appropriate services to Class members for a period of time deemed appropriate by the Court." *Id.* at 413. (quotations omitted). They also requested a "monitor who will assist in the development of remedial plans including, but not limited to: early education, education intervention programs, [and] criminal and juvenile justice evaluations." *Id.* (quotations omitted).

---

(Dkt. 204 at 31–32.) This is in contrast to a position that they took earlier (Dkt. 143 at 37 n.1), and contrary to controlling caselaw, *see Alden v. Maine*, 527 U.S. 706, 757 (1999) (citing cases) ("Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally.")

Here, plaintiffs similarly seek an order "to remediate the harm caused by the Government Defendants' unconstitutional conduct." And this includes the exact same relief as that set forth in *Boler*. *Boler* therefore controls and requires the same outcome. The claim for injunctive relief against Governor Snyder in his official capacity may go forward.

2019 U.S. Dist. LEXIS 55607, at *106–08 (footnote omitted) (citations omitted). Like in *Carthan*, plaintiffs in this case seek "[a]n injunctive order to remediate the harm caused by Defendants' unconstitutional conduct." (Dkt. 185-2 at 206.) This includes the "repairs of private property" and the "establishment of medical monitoring to provide health care." (*Id.*) In short, plaintiffs seek exactly the same relief that the Sixth Circuit in *Boler* characterized as prospective injunctive relief. Therefore, *Boler* again controls and plaintiffs' official capacity claims against Governor Snyder for injunctive relief may go forward.

Second, the City of Flint argues that sovereign immunity deprives the Court of jurisdiction to hear plaintiffs' claims against it, because it was an arm of the state for sovereign immunity purposes during the relevant period. (Dkt. 137 at 45–53). Yet this is an argument that has been rejected on several prior occasions—recently, by the Sixth Circuit in

*Guertin*. 912 F.3d at 941. The City's argument is therefore rejected. The Court has subject matter jurisdiction to hear the claims against it.

### ii.    Absolute Immunity

Defendants Wyant and Wurfel claim absolute immunity from plaintiffs' § 1983 claims. They rely on the immunity awarded to federal officials carrying out discretionary prosecutorial actions, arguing that they were in effect acting as federal officials even though they were in fact state employees leading up to and during the Crisis. (Dkt. 141 at 41–42; Dkt. 142 at 37–38.) However, the Sixth Circuit rejected this argument in *Mays*. 871 F.3d at 444–47. And in addition, Wyant and Wurfel do not explain how their claim of immunity interacts with plaintiffs' allegations as pleaded. They instead hypothesize that absolute immunity could apply if "[p]laintiffs' claims . . . ultimately prove to be an alleged failure . . . to sufficiently enforce the [Safe Drinking Water Act] and/or initiate enforcement proceedings against Flint." (Dkt. 141 at 42; Dkt. 142 at 38); *see also Carthan*, 2019 U.S. Dist. LEXIS 55607, at *108–09. For both reasons, Wyant and Wurfel's claims are denied.

### iii.    Safe Drinking Water Act Preemption

The MDEQ defendants argue that plaintiffs' § 1983 claims are preempted by the Safe Drinking Water Act, 42 U.S.C. §§ 300f–300k

(2016). (Dkt. 139 at 26.) Both the Sixth Circuit and this Court have previously rejected this argument. *Boler*, 865 F.3d at 409; *Carthan*, 2019 U.S. Dist. LEXIS 55607, at *109. Here too, the MDEQ defendants' claim is denied.

## D.  Analysis

The Court will address defendants' motions to dismiss each count in the order listed in the table in Section III.A.

### i.  State-Created Danger

In Count I, plaintiffs bring a claim under § 1983, alleging that the government defendants violated their Fourteenth Amendment right to be free from a state-created danger. (Dkt. 192-1 at 5.) Plaintiffs plead that the government defendants created the conditions that led to the Flint Water Crisis. And because these defendants knew or should have known of the danger they created, they are liable to plaintiffs for the injuries that resulted. (*Id.*) The government defendants move to dismiss. (Dkt. 137 at 27–55; Dkt. 138 at 19–23; Dkt. 139 at 27–32; Dkt. 141 at 31–33; Dkt. 142 at 27–28; Dkt. 143 at 57–59; Dkt. 203 at 30–35; Dkt. 204 at 40; Dkt. 205 at 28; Dkt. 206 at 26.) For the following reasons, defendants' motions are granted.

In *Carthan*, the Court addressed a nearly identical claim and set forth the appropriate legal framework:

> To bring a state-created danger claim, the individual must show: (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

2019 U.S. Dist. LEXIS 55607, at \*122 (quoting *Carthan v. Snyder*, 329 F. Supp. 3d 369, 392 (E.D. Mich. 2018)).

With respect to (1), the Court elaborated:

> Plaintiffs do not allege that any defendant created or increased the risk that they would be exposed to an act of violence by a third party. They argue, however, that they do not need to, based on *Schneider v. Franklin Cty.*, 288 F. App'x. 247 (6th Cir. 2008). In that case, the Sixth Circuit analyzed a state-created danger claim without referencing the third-party requirement of the test. *Id.* at 252.

> However, it is clear that *Schneider* applied an incomplete version of this circuit's test for a state-created danger claim. The *Schneider* court cited *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998), in setting forth the state-created danger standard. In doing so, however, the *Schneider* court omitted *Kallstrom*'s reference to the threat of violence by a private third party, and then proceeded to analyze the claim without that requirement.

In support of the argument that the *Schneider* standard is good law in the Sixth Circuit, plaintiffs cite *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834 (6th Cir. 2016) and *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006), two cases that also analyzed state-created danger claims.

*Stiles* involved a state-created danger claim arising from the brutal emotional, psychological, and physical bullying of a junior high school student by other students. *Id.* at 840–46. The *Stiles* court stated:

> As a general rule, the State has no obligation to protect the life, liberty, [or] property of its citizens against invasion by *private actors*. Two exceptions to this rule exist: 1) where the State enters into a "special relationship" with an individual by taking that person into its custody, and 2) where the State creates or increases the risk of harm to an individual. Because DS was harmed by students rather than school or government officials, there is no constitutional violation unless one of these two exceptions applies.

*Id.* at 853 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)) (internal citations omitted) (emphasis added). The court then cited *McQueen*, *supra*, for the legal standard for a state-created danger claim. *Id.* at 854. The standard set forth was: "(1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at large, and (3) the requisite degree of state culpability." *Id.* at 854 (citing *McQueen*, 433 F.3d at 464).

In *McQueen*, the Sixth Circuit considered whether a grant of summary judgment on a state-created danger claim was proper where a first-grader shot and killed his classmate, and the deceased child's parent sued the teacher, principal, and school district. *McQueen*, 433 F.3d at 462–63. The

plaintiff brought a variety of claims, among them a state-created danger claim for failing to protect her daughter from her classmate. *Id.* at 463.

Quoting *Kallstrom*, the *McQueen* court stated that "[l]iability under the state-created danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id.* at 464 (quoting *Kallstrom*, 136 F.3d at 1066). The court also noted that a state-created danger claim is traditionally rejected where the act "did not create or increase the risk of private violence to the plaintiff." *Id.* at 465 (collecting cases).

In most other circuits, the third-party requirement is also consistently applied. *See Rivera v. Rhode Island*, 402 F.3d 27, 34–35 (1st Cir. 2005); *Lombardi v. Whitman*, 485 F.3d 73, 80 (2d Cir. 2007); *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995); *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 857 (5th Cir. 2012); *Fields v. Abbott*, 652 F.3d 886, 889 (8th Cir. 2011); *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 917 (10th Cir. 2012); *Perez-Guerrero v. U.S. Atty. Gen.*, 717 F.3d 1224, 1233–34 (11th Cir. 2013); *Butera v. Dist. Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001). *But see Doe v. Village of Arlington Heights*, 782 F.3d 911, 916–17 (7th Cir. 2015) (omitting third-party requirement).

In *Kneipp v. Tedder*, 95 F.3d 1199, 1204–11 (3d Cir. 1996), the Third Circuit analyzed the third-party requirement for a state-created danger claim and declined to apply it to the claim in front of it, instead opting to apply a standard requiring only that an individual be placed in danger. However, the Third Circuit has inconsistently applied the third-party requirement to state-created danger claims since *Kneipp*. *See, e.g.*, *LaGuardia v. Ross Twp.*, 705 F. App'x. 130, 133 (3d Cir. 2017) (applying the requirement). *But see Henry v. City of Erie*, 728 F.3d 275 (3d Cir. 2013) (omitting the requirement).

Because all events related to plaintiffs' claims occurred in Michigan, the Court must apply the clearly established state-created danger test set forth in *Kallstrom*, *McQueen*, *Stiles*, and *Jones*. The complaint does not plead that any act taken by any state actor created or increased the risk of private violence to the plaintiffs.

At oral argument, plaintiffs' counsel argued that the third-party requirement could be satisfied by, for instance, a situation where a mother fed her child formula mixed with tainted Flint water. The mother would be the private actor, and the child would be the individual harmed under the state-created danger theory.

The Court rejects this theory in its entirety. The residents of Flint were all made to use contaminated water that leached lead and bacteria from old lines. Parents, many of them struggling to even pay for the water the city provided, whether from the DWSD or the Flint River, used what resources they had available to them. For much of the time the Flint River was used as Flint's primary water source, residents did not and could not have known the danger the water posed to them or their families. To entertain plaintiffs' counsel's theory of harm, the Court would have to find that a loving parent, seeking only to provide their child with food or water, committed an intentional or at least negligent act of violence against his or her own child. According to counsel, every person who showered or washed their hands or made coffee or boiled pasta with bacteria-infected, lead-tainted water provided to them by their government committed repeated acts of violence against themselves, their families, their friends, and their guests. This is not what the state-created danger theory was developed to address.

Plaintiffs have failed to plead that the actions of the governmental actors named in this claim created or increased

the risk of harm from a third party, and for this reason, this particular claim must be dismissed.

*Id.* at *122–27 (citations omitted) (quoting 329 F. Supp. 3d at 392–94).

Although the Court could have dismissed the claim solely on that basis, it continued and analyzed (2):

> Even if the Court could determine that the third-party harm requirement of plaintiffs' state-created danger claim had been met, such a claim will stand only where "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Reynolds*, 438 F.3d at 696. The state-created danger must be a "special danger" to a "discrete class of individuals." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005). It is not sufficient for the purposes of this claim if the specific danger is "no more a danger to [the plaintiff] than to any other citizen on the City streets." *Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir. 1993). The danger may not be one that "affects the public at large." *Kallstrom*, 136 F.3d at 1066.

> Plaintiffs argue that the entire population of Flint constitutes a discrete class of individuals. They argue that the "government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims," *Reynolds*, 438 F.3d at 696, because "identifying those at risk would have been as simple as looking up the names and addresses of residents and businesses serviced by Flint's water."

> The Sixth Circuit has routinely held that threats to any person on the street or to the public at large do not constitute risks that are specific enough for the purposes of a state-created danger claim. *See, e.g.*, *City of Carlisle*, 3 F.3d at 950 (the city permitting an epileptic individual to maintain a driver's license posed a danger to any citizen on the streets);

*Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (a parolee's release endangered plaintiff as a member of the public at large); *Schroeder*, 412 F.3d at 729 (government's creation of a street, and management of traffic conditions, posed a general risk to the public).

The largest groups the Sixth Circuit has determined were able to pursue a state-created danger claim were in *Kallstrom*, where a city's release of private information from the personnel files of three undercover officers "placed the personal safety of the officers and their family members, as distinguished from the public at large, in serious jeopardy," 136 F.3d at 1067, and in *McQueen*, where the risk of a shooter in a school posed a risk to the five students in the room with him and even those in the school building, but all those outside the school building constituted "the general public." 433 F.3d at 468.

An entire city, plus all those who visit, work, or pass through that city is, by definition, "the general public." Plaintiffs set the bar for the general public at "the general public of Michigan residents." However, there is no case that supports this definition.

This claim must also be dismissed for failure to satisfy this element of the state-created danger test.

*Id.* at *127–29 (citations omitted) (quoting 329 F. Supp. 3d at 394–95). In this case, plaintiffs' state-created danger claim is identical to that in *Carthan*, and so the same reasoning applies here. Defendants' motions to dismiss plaintiffs' claim is granted.

### ii.  Bodily Integrity

In Count II, plaintiffs bring a claim under § 1983, alleging that the government defendants violated their substantive due process right to bodily integrity. (Dkt. 192-1 at 5.) In plaintiffs' view, these defendants were deliberately indifferent to the risk of harm they faced, creating and exacerbating their exposure to Flint's contaminated water. (Dkt. 185-2 at 170–72.) The government defendants move to dismiss. (Dkt. 137 at 55–58; Dkt. 138 at 23; Dkt. 139 at 33–39; Dkt. 141 at 22–31; Dkt. 142 at 22–26; Dkt. 143 at 59–66; Dkt. 203 at 36–44; Dkt. 204 at 40–52; Dkt. 205 at 28–29; Dkt. 206 at 23–26.) The Court grants these motions in part and denies them in part for the reasons that now follow.

As established in Part II, plaintiffs unknowingly relied on contaminated water provided by government officials, encroaching upon their right to bodily integrity. *See supra* Section II.C.ii.b. To state a bodily integrity claim on these facts, plaintiffs must demonstrate that (1) the government defendants knew of facts from which they could infer a substantial risk of serious harm, (2) they did infer it, and (3) they nonetheless acted with indifference, demonstrating a callous disregard

towards the rights of those affected. *Id.* The Court will address the allegations against each group of government defendants in turn.[24]

### a. State Defendants

Plaintiffs allege that defendants Governor Snyder, Andrew Dillon, and Nick Lyon violated their right to bodily integrity. Plaintiffs successfully state a claim against Governor Snyder. *See supra* Section II.C.ii.b. And as now explained, plaintiffs plead a valid bodily integrity claim against Dillon, but not against Lyon.

*Andrew Dillon.* Dillon was also a named defendant in *Carthan*. There, the Court stated that

> [Dillon] allegedly knew that the Flint River had been rejected as a water source as recently as 2011, and that the FWTP would require substantial improvements to safely process the river's water. From this, it is reasonable to believe that Dillon was aware of the risks associated with using the Flint River as a water source. Yet despite this knowledge, Dillon helped to develop an interim plan that saw Flint transition to the Flint River. And importantly, he rejected a final bid from DWSD that could have obviated the need to use water from the Flint River until the FWTP had the capacity to treat it safely. This demonstrated an indifference to the risk of serious harm plaintiffs faced, made all the more inexplicable given that he knew DWSD presented the most cost effective mid-term option.

---

[24] Because the right to bodily integrity is clearly established, defendants cannot rely on qualified immunity if plaintiffs state a valid claim against them. *See supra* Section II.C.ii.b.

2019 U.S. Dist. LEXIS 55607, at *111–12 (footnote omitted). The amended master complaint contains much the same allegations. Therefore, the Court sees no reason to deviate from its prior decision. Plaintiffs state a valid bodily integrity claim against Dillon.

*Nick Lyon.* As with Dillon, Lyon was also a named defendant in *Carthan*. The Court explained:

> It is reasonable to conclude that Lyon was aware of the risk of harm plaintiffs faced. As the crisis unfolded, he received materials showing an outbreak of Legionnaires' disease in Flint. He also received emails from senior government officials raising concerns about possible lead contamination in Flint's water. Moreover, he was surely aware that these incidents coincided with the transition to the Flint River. However, plaintiffs fail to show how Lyon was deliberately indifferent. It is true that he did not make the information he received public, nor did he alert other government departments. But he directed his team to investigate the reports and emails, which shows his concern. And plaintiffs do not plead that Lyon attempted to cover up what was happening. Therefore, without more, the claim against Lyon does not rise to the level of deliberate indifference.

*Id.* at *112–13 (footnote omitted). As in *Carthan*, it is plausible to infer here that Lyon was aware of the risk of harm plaintiffs faced. Plaintiffs again plead that Lyon received information about lead contamination and Legionaire's disease. But as in *Carthan*, plaintiffs in this case also

fail to show how Lyon was deliberately indifferent to the risk, as there is no indication that he covered up or otherwise exacerbated the Crisis. As such, plaintiffs fail to state a bodily integrity claim against Lyon.

### b. MDEQ Defendants

Plaintiffs allege that defendants Daniel Wyant, Bradley Wurfel, Stephen Busch, Patrick Cook, Michael Prysby, and Adam Rosenthal violated their right to bodily integrity. Plaintiffs successfully state a claim against defendants Cook, Prysby, and Rosenthal, but not Wyant, for the reasons discussed above. *See supra* Section II.C.ii.b. For the reasons now stated, plaintiffs also state a bodily integrity claim against Wurfel and Busch.

*Bradley Wurfel.* In *Carthan*, the Court stated the following regarding the claim that Wurfel violated plaintiffs' right to bodily integrity:

> [Wurfel] knew of ample facts from which to infer that plaintiffs were facing a substantial risk of harm, and it is reasonable to conclude that he did infer it. For example, Wurfel knew about the outbreak of Legionnaires' disease. And he was also well aware that something was wrong with Flint's water. Moreover, plaintiffs demonstrate that Wurfel acted with deliberate indifference. On several occasions as the crisis unfolded, he publicly denied that there was a problem with Flint's water. He appeared on radio and television to advise listeners that the water was safe to consume and bathe in,

and he discredited others who suggested that lead was leaching into Flint's water. Such indifference showed a callous disregard for plaintiffs' right to bodily integrity.

2019 U.S. Dist. LEXIS 55607, at *113–14. The allegations in the present case track those pleaded in *Carthan*. So plaintiffs in this case similarly plead sufficient facts from which it can be inferred that Wurfel not only knew of the harm plaintiffs faced, but also that he took steps to deceive them into thinking that the water was safe to rely on. Plaintiffs therefore state a valid bodily integrity claim against Wurfel.[25]

*Stephen Busch*. The *Carthan* Court also considered a bodily integrity claim pleaded against defendant Busch:

It is reasonable to assume that [he was] aware of the substantial risk of harm plaintiffs faced. Before Flint's transition to the Flint River, . . . Busch knew of the risks associated with the Flint River. In addition, [he] recognized

---

[25] Plaintiffs' factual allegations against Wurfel include public statements he made in his capacity as the MDEQ's Director of Communications about the quality of Flint's water. In his motion to dismiss, Wurfel argues that these statements are absolutely privileged under state common law and therefore not actionable. (Dkt. 142 at 56–58.) The Court acknowledges that § 1983 was enacted against the background of state common law, *see Heck v. Humphrey*, 512 U.S. 477, 483 (1994), but Wurfel cites to no case, and the Court can find none, holding that an absolute privilege applies in this context—a claim that the right to bodily integrity was violated. Wurfel also argues that a qualified privilege may apply. (Dkt. 142 at 58–60.) But the crux of Wurfel's argument here is that he was making public statements in good faith, and this runs counter to plaintiffs' allegations that he recklessly misled them. If a qualified privilege applies—which is far from clear –Wurfel may renew this argument following discovery.

that the FWTP was not ready to begin operations[.] Moreover, Busch . . . knew that the transition had created the conditions for legionella bacteria to flourish. Not to mention the fact that the EPA and civic leaders were raising concerns about the quality of Flint's water.

Yet despite knowing of these serious risks, [Busch was] indifferent to them[.] [He] resolved the regulatory hurdles associated with Flint's use of the Flint River. Furthermore, [he] took steps to deceive Flint's residents into continuing to drink and bathe in the contaminated water. Busch . . . misled the EPA by falsely suggesting that the proper corrosion control was in use at the FWTP; and . . . directly or indirectly altered reports to remove results showing high lead concentrations in Flint's water. These actions exhibited a callous disregard for plaintiffs' right to bodily integrity.

2019 U.S. Dist. LEXIS 55607, at *114–15 (footnote omitted). In this case, plaintiffs plead the same allegations against Busch. For example, they plead that he knew that the FWTP was not ready to begin operations at the time of the transition to the Flint River. Additionally, they allege that he was involved in misleading Flint residents so that they continued to rely on the City's contaminated water. So like in *Carthan*, plaintiffs, here, have stated a valid bodily integrity claim against Busch.[26]

---

[26] The MDEQ defendants argue that the short-form complaint is deficient in several regards, thus requiring that it be dismissed in its entirety regardless of whether it states a valid bodily integrity claim against them. One of these concerns is certainly valid: that state-law claims included in the prior short-form complaint but omitted from the operative amended short-form complaint have been voluntarily dismissed. (Dkt. 203 at 23–25.) The Court agrees and will only address those claims

### c. City Defendants and Jeffery Wright

Plaintiffs allege that defendants Darnell Earley, Gerald Ambrose, Dayne Walling, Howard Croft, Michael Glasgow, Daugherty Johnson, and Jeffrey Wright violated their right to bodily integrity. Plaintiffs successfully state a claim against Glasgow, Johnson, and Croft. *See supra* Section II.C.ii.b. Additionally, for the reasons set forth below, they also plead a valid claim against Earley and Ambrose, but not against Wright and Walling.

*Darnell Earley and Gerald Ambrose*. The *Carthan* plaintiffs also alleged that Earley and Ambrose violated their right to bodily integrity. There, the Court explained that:

> It is reasonable to infer that Earley and Ambrose were aware of the substantial risk of harm plaintiffs faced. After Flint transitioned to the Flint River, they knew about the outbreak of Legionnaires' disease; General Motors stopped using Flint water at its Flint factory because of its corrosive nature; and test results revealed high lead levels in two locations on the University of Michigan-Flint's campus. There were even growing calls from senior government officials that

included in the amended short-form complaint in this opinion. The others are presumed voluntarily dismissed.

The MDEQ defendants' other concerns appear to center on factual issues. For example, the MDEQ defendants disagree with plaintiffs' assessment that the dates of residency are the same for all plaintiffs. (Dkt. 139 at 16.) Defendants certainly need to know various things about plaintiffs to mount a defense. However, discovery is the vehicle for developing the factual record.

Flint "should try to get back on the Detroit system as a stopgap ASAP before this thing gets too far out of control." Additionally, plaintiffs plead that Earley and Ambrose were indifferent to this risk. Earley publicly denied any connection between the Legionnaires' disease outbreak and Flint's water, despite knowing that other branches of government concluded that there was a link. And he repeatedly refused to consider returning to DWSD water. Having replaced Earley as the Emergency Manager, Ambrose also refused to return to DWSD. He even went so far as rejecting a Flint City Council vote to reconnect to DWSD. In both cases, Earley and Ambrose's conduct thus showed a callous disregard for plaintiffs' right to bodily integrity.

*Carthan*, 2019 U.S. Dist. LEXIS 55607, at *116–17 (citations omitted).

Plaintiffs, here, plead substantively the same allegations against Earley and Ambrose. Again, the Court sees no reason to deviate from its decision in *Carthan*, and as a result, plaintiffs have stated a valid bodily integrity claim against these defendants.

*Wright and Walling*. With respect to Wright and Walling, the Court in *Carthan* explained that:

[P]laintiffs fail to state a claim against Wright because they do not show how he either caused or prolonged their exposure to the contaminated water. First, plaintiffs do not plausibly allege that Wright caused their exposure because he had no oversight over Flint's transition to the Flint River. Plaintiffs argue that Flint and Genesee County's water systems were unified, suggesting that Wright's position as Genesee County's Drain Commissioner gave him the means to affect the choice of Flint's water. But the fourth amended complaint reveals that the arrangement between Flint and

Genesee County was a standard contractual relationship. Those in charge of Flint's system purchased water and then sold it to Genesee County. And although Genesee County was required to buy it, the County had no say in where it came from. In other words, Wright was in charge of Genesee County's water system, but not Flint's.

Second, Wright did not prolong plaintiffs' exposure to the contaminated water. Plaintiffs do not plead that Wright took steps to deceive Flint residents about the safety of Flint's water following the transition, or that he otherwise played a role in any coverup. Although Wright may have been aware of the risk of harm plaintiffs faced, he did not cause their injuries.

The same goes for . . . Walling. Here too, plaintiffs fail to state a claim against [him] because they do not show how [he] caused or prolonged plaintiffs' exposure to the contaminated water . . . Walling was involved in the decision to use the Flint River as an interim source of water but he was stripped of virtually all authority over Flint's operations during emergency management. Plaintiffs also do not allege that [he] deceived plaintiffs about the safety of Flint's water or that [Walling] helped coverup the crisis. Thus, plaintiffs have failed to state a claim against [him].

2019 U.S. Dist. LEXIS 55607, at *118–20 (citations omitted). In the present case, plaintiffs' allegations suffer from the same causation problem. The amended master complaint contains insufficient factual matter from which it can be inferred that either Wright or Walling caused or prolonged their exposure to Flint's contaminated water. With Wright in particular, plaintiffs rely on the same contractual arrangement

allegation to argue that he had control over the Flint water system. And with Walling, plaintiffs again fail to allege what control he had considering the extent of emergency management. For this reason, plaintiffs fail to state a bodily integrity claim against these defendants.

*

In sum, plaintiffs state a bodily integrity claim against Governor Snyder, Dillon, Wurfel, Busch, Cook, Prysby, Rosenthal, Earley, Ambrose, Glasgow, Johnson, and Croft. But they do not state a bodily integrity claim against Lyon, Wyant, Wright, or Walling.

### iii.    Equal Protection

In Counts III and IV, plaintiffs bring suit under § 1983, alleging that defendants Snyder, Dillon, Wright, Ambrose, Kurtz, Earley, Wyant, Prysby, and Busch violated their right to equal protection under the Fourteenth Amendment. (Dkt. 185-2 at 172–80.) For the reasons set forth above, plaintiffs fail to state a claim and these counts are dismissed. *See supra* Section II.C.ii.c.

### iv.    Conspiracy

In Count V, plaintiffs bring suit under § 1985(3), alleging that defendants Snyder, Dillon, Wright, Ambrose, and Earley conspired to violate their constitutional rights. (Dkt. 185-2 at 180–85.) For the reasons

set forth above, plaintiffs fail to state a claim and this count is dismissed. *See supra* Section II.C.ii.e.

### v. Elliott-Larsen Civil Rights Act

In Count VI, plaintiffs allege that defendants Snyder, Dillon, Wright, Ambrose, Earley, the City of Flint, Wyant, Prysby, and Busch violated their rights guaranteed under Michigan's ELCRA. (Dkt. 185-2 at 185–90.) Again, for the reasons set forth above, plaintiffs fail to state an ELCRA claim. *See supra* Section II.C.ii.d. The Court therefore dismisses this count.

### vi. Gross Negligence

In Count VII, plaintiffs allege that defendants Snyder, Dillon, Lyon, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Earley, Ambrose, Croft, Johnson, and Glasgow committed gross negligence. (Dkt. 185-2 at 190–93.) As stated above in Section II.C.ii.f., plaintiffs fail to state a claim and the Court dismisses this count.[27]

---

[27] The MDEQ defendants argue that plaintiffs' state law claims are preempted by the Michigan Safe Drinking Water Act, Mich. Comp. Laws §§ 325.1001–23, or alternatively, that they are absolutely immune from any state law liability. (Dkt. 139 at 19–21, 39–43) Because plaintiffs fail to state an ELCRA or gross negligence claim against these defendants, the Court need not to reach this issue.

### vii.  *Monell* Liability

Plaintiffs allege that the City of Flint is liable under § 1983, as a result of the unconstitutional actions taken by Earley, Ambrose, and Walling. (Dkt. 185-2 at 10–11, 14–16.) The City of Flint moves to dismiss. (Dkt. 137 at 68–70.)

Under *Monell v. Department of Social Services of the City of New York*, a plaintiff can bring a § 1983 claim against a city for the unconstitutional conduct of its employees, if the employees' conduct implemented a policy "officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). However, a municipality "cannot be held liable *solely* because it employs a tortfeasor." *Id.* at 691. Liability will only attach where the policy or custom was the "moving force" behind the constitutional violation. *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).

In *Carthan*, the Court held that Earley and Ambrose "were final decisionmakers for Flint with respect to the decision to provide residents with contaminated water." 2019 U.S. Dist. LEXIS 55607, at *130 (citing *Carthan*, 329 F. Supp. 3d at 421–22). And that "their actions represented

official policy and Flint could be held liable for their conduct insofar as it violated plaintiffs' rights." *Id.* (citing *Carthan*, 329 F. Supp. 3d at 422).

As set forth above, plaintiffs state a claim that Earley and Ambrose violated their constitutional right to bodily integrity. *See supra* Section III.D.ii.d. As such, plaintiffs state a *Monell* claim against the City of Flint with respect to this right. *Carthan*, 2019 U.S. Dist. LEXIS 55607, at *130–31.[28] The City of Flint's motion to dismiss is therefore denied, and plaintiffs' *Monell* claim may go forward.[29]

### viii. Professional Negligence

#### a. LAN

In Count IX, plaintiffs allege that defendant LAN committed professional negligence. (Dkt. 192-1 at 5.) LAN has not moved to dismiss this count directly. Rather, LAN moves to dismiss more generally by arguing that the complaint provides insufficient notice of LAN's alleged wrongdoing. (Dkt. 144 at 29–33.) LAN argues that plaintiffs should be

---

[28] This is not because the City is liable for Earley and Ambrose's general conduct, s*ee Monell*, 436 U.S. at 691, but because their unconstitutional acts represented the implementation of city policy.

[29] Because defendant Walling had no real control over the City of Flint while emergency management persisted, *see supra* Section III.D.ii., plaintiffs' *Monell* claim against the City of Flint cannot rest on his alleged conduct.

ordered to provide a more definite statement, at a minimum. (*Id.* at 33–35.)

LAN presented this same argument in *Carthan*. There, the Court denied it. 2019 U.S. Dist. LEXIS 55607, at *149–50. The allegations in this case are comparable to those in *Carthan*, and LAN offers no reason why the Court should deviate from its prior decision.[30] Therefore, plaintiffs' claim of professional negligence against LAN may go forward.

### b. Rowe

In Count X, plaintiffs allege that defendant Rowe committed professional negligence. (Dkt. 192-1 at 5.) Rowe has not filed a motion to dismiss and this claim may go forward.

### c. Veolia

In Count XI, plaintiffs allege that defendant Veolia committed professional negligence. (Dkt. 192-1 at 5.) Veolia has not moved to dismiss this count directly.[31] This claim can also go forward.

---

[30] Likewise, LAN objects to personal jurisdiction. (Dkt. 145.) However, LAN concedes that this Court previously rejected this argument and brings it solely to preserve the claim on appeal.

[31] Like LAN, Veolia has challenged the sufficiency of the complaint more generally. (Dkt. 140 at 25–29.) Again, the Court rejects this argument. Combined, the amended master and short-form complaints contain enough factual matter to put Veolia on adequate notice of the allegations against it.

### ix. Damages

#### a. Punitive

Plaintiffs request punitive damages.[32] (Dkt. 185-2 at 193.) Defendants move to dismiss. (Dkt. 137 at 103–04; Dkt. 138 at 5; Dkt. 139 at 70–71; Dkt. 140 at 22–23; Dkt. 141 at 57–58; Dkt. 142 at 55–56; Dkt. 143 at 86–87; Dkt. 144 at 27–28; Dkt. 204 at 57.)

In this opinion and order, the Court is dismissing all but two types of claims. First, plaintiffs successfully plead a claim under § 1983 that certain government defendants violated their right to bodily integrity; and second, plaintiffs state a claim that the private defendants were professionally negligent under state law. Plaintiffs concede that they cannot request punitive damages with respect to their professional negligence claims. (Dkt. 153 at 146 n.47.) So the Court therefore grants defendants LAN and Veolia's motions to dismiss in this regard.[33] But

---

[32] In the amended master complaint, plaintiffs do this in three ways. First, they request punitive damages at the end of most counts. Second, they have a stand-alone Count VIII that also requests punitive damages. And finally, they include a claim for punitive damages in their prayer for relief. Although this is somewhat confusing, the Court reads plaintiffs' short-form complaint as incorporating a request for punitive damages with respect to each count.

[33] Again, defendant Rowe has not filed a motion to dismiss. However, the punitive damages claim against Rowe cannot proceed either.

punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *King v. Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Plaintiffs plausibly plead recklessness and indifference to the right to bodily integrity. *See supra* Section III.D.ii. As a result, the government defendants' motions to dismiss are denied with respect to plaintiffs' § 1983 bodily integrity claims.

### b. Exemplary

In addition to punitive damages, plaintiffs request exemplary damages from defendants LAN, Rowe, and Veolia.[34] However, the Court has previously denied exemplary damages under exactly the same circumstances, where it explained:

> In Michigan, exemplary damages are a special class of compensatory damages. They are available under limited circumstances to reimburse for a non-economic harm.

---

[34] Plaintiffs also request exemplary damages from defendants Governor Snyder, Dillon, Lyon, Rosenthal, Busch, Cook, Prysby, Wurfel, Wright, Kurtz, Earley, Ambrose, Croft, Johnson, and Glasgow. (Dkt. 185-2 at 190–93.) But they do so only with regards to plaintiffs' gross negligence claim. The Court has already ruled that this claim is not viable, so there is no need to address whether exemplary damages are available with respect to that count. *See supra* Section III.D.vi.

*Veselenak v. Smith*, 414 Mich. 567, 573–74 (1982); *Unibar Maint. Servs., Inc. v. Saigh*, 283 Mich. App. 609, 630 (2009). And in the context of exemplary damages, this only includes losses for the "humiliation, sense of outrage, and indignity" that results from malicious, willful, and wanton conduct. *Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 419 (1980); *B & B Inv. Grp. v. Gitler*, 229 Mich. App. 1, 9–10 (1998).

The malicious, willful, and wanton element is equivalent to malice. *See Peisner v. Detroit Free Press, Inc.*, 421 Mich. 125, 136 (1984). Because damages for mental pain and anxiety are normally included under actual damages, only intentional actions that show a reckless disregard for a plaintiff's rights will suffice. *See Veselenak*, 414 Mich. at 574–75; *McPeak v. McPeak*, 233 Mich. App. 483, 487–88 (1999). In other words, mere negligence is insufficient. A defendant's conduct must amount to more than a lack of care. *See Veselenak*, 414 Mich. at 574–75.

Here, the fact that professional negligence is the only claim plaintiffs raise to support exemplary damages against LAN and Veolia negates the mental element required for the award. It is the reprehensibility of a defendant's conduct that intensifies the emotional injury and justifies exemplary damages not the magnitude of the harm caused. *See McPeak*, 233 Mich. App. at 488; *Gitler*, 229 Mich. App. at 10. Plaintiffs do not state a claim for allegedly malicious, willful, and wanton conduct. In fact, they do not state a claim involving exemplary damages for any intentional tort. Rather, they argue that LAN and Veolia were professionally negligent and that their negligence caused the Flint Water Crisis. As such, plaintiffs fail to state a claim for exemplary damages.

*Carthan*, 2019 U.S. Dist. LEXIS 55607, at *147–48. What was true there is true here. Plaintiffs only allege professional negligence against LAN,

Rowe, and Veolia. Therefore, their claim for exemplary damages against these defendants is dismissed.

### c. Joint and Several Liability

Plaintiffs allege that the named defendants are "jointly and severally" liable. (Dkt. 192-1 at 3.) However, Michigan has replaced joint and several liability with fair share liability. *See Smiley v. Corrigan*, 248 Mich. App. 51, 55 (2001). Plaintiffs concede this point. (Dkt. 153 at 64.) As a result, any claim for joint and several liability is dismissed.

### E. Conclusion

Defendants' motions to dismiss plaintiffs' amended short-form complaint are granted in part and denied in part. More specifically, defendants' motions to dismiss: Count I (state-created danger) are granted; Count II (bodily integrity) are granted with respect to defendants Lyon, Wyant, Wright, and Walling, but denied with respect to defendants Governor Snyder, the City of Flint (*Monell*), Dillon, Wurfel, Busch, Cook, Prysby, Rosenthal, Earley, Ambrose, Glasgow, Johnson, and Croft; Counts III and IV (equal protection) are granted; Count V (conspiracy) are granted; Count VI (ELCRA) are granted; Count VII (gross negligence) are granted; Count VIII (punitive damages) are granted with respect to plaintiffs' professional negligence claims, but

denied with respect to plaintiffs' § 1983 claims. In addition, plaintiffs' professional negligence counts can go forward, but the request for exemplary damages is dismissed along with any claim for joint and several liability.

## IV. Motions to Dismiss in *Sirls v. Michigan*, No. 17-cv-10342

For the purpose of adjudicating defendants' motions to dismiss in *Sirls*, the Court adopts plaintiffs' amended short form complaint (Dkt. 131-1) as the operative short-form complaint. It contains exactly the same allegations as the *Walters* complaint: the same named defendants, the same alleged injuries, and the same counts. Therefore, the Court reaches the same conclusions as set forth above in Part III.

## V. Order

IT IS ORDERED THAT,

In *Waters v. Flint*, No. 17-cv-10164,

Plaintiffs' motion for leave to amend the master complaint in 17-cv-10164 (Dkt. 185) is **GRANTED** in part and **DENIED** in part. Leave is granted to amend the complaint to include plaintiffs' revised bodily integrity claims against defendants Governor Snyder, Rosenthal, Cook, Prysby, Glasgow, Johnson, and Croft. But leave is denied to amend the complaint to include plaintiffs' remaining claims. Additionally, the Court

finds no reason to deny leave to include the new factual allegations contained within the proposed amended master complaint, and so plaintiffs' motion as it relates to these allegations is also **GRANTED**.

Having adopted the amended master complaint as the operative master complaint and plaintiffs' proposed amended short-form complaint (Dkt. 192-1) as the operative short-form complaint, IT IS FURTHER ORDERED THAT,

The city defendants' motion to dismiss (Dkt. 137) is **GRANTED** in part and **DENIED** in part; Jeffrey Wright's motion to dismiss (Dkt. 138) is **GRANTED**; the MDEQ defendants' motions to dismiss (Dkts. 139, 141, 142, 150) are **GRANTED** in part and **DENIED** in part; Veolia's motions to dismiss (Dkts. 140, 199) are **GRANTED** in part and **DENIED** in part; the state defendants' motion to dismiss (Dkt. 143) is **GRANTED** in part and **DENIED** in part; and LAN's motions to dismiss (Dkts. 144, 145) are **GRANTED** in part and **DENIED** in part. In addition, since they are no longer defendants in this case, Nancy Peeler and Robert Scott's motions to dismiss (Dkts. 147, 148) are **DENIED** as moot.

As a result, plaintiffs' bodily integrity claims against defendants, Governor Snyder, the City of Flint (*Monell*), Dillon, Wurfel, Busch, Cook,

Prysby, Rosenthal, Earley, Ambrose, Glasgow, Johnson, and Croft can proceed; their professional negligence claims against defendants LAN, Rowe, and Veolia can proceed; and plaintiffs may continue to request punitive damages with respect to their remaining § 1983 claims. However, in all other respects, plaintiffs' claims are dismissed.

In *Sirls v. Michigan*, No. 17-cv-10342,

Having adopted the amended master complaint as the operative master complaint and plaintiffs' proposed amended short-form complaint (Dkt. 131-1) as the operative short-form complaint, IT IS FURTHER ORDERED THAT,

The city defendants' motion to dismiss (Dkt. 82) is **GRANTED** in part and **DENIED** in part; Jeffrey Wright's motion to dismiss (Dkt. 85) is **GRANTED**; the MDEQ defendants' motions to dismiss (Dkts. 86, 88, 89, 97, 140) are **GRANTED** in part and **DENIED** in part; Veolia's motions to dismiss (Dkts. 87, 135) are **GRANTED** in part and **DENIED** in part; the state defendants' motions to dismiss (Dkt. 90, 139) are **GRANTED** in part and **DENIED** in part; and LAN's motions to dismiss (Dkts. 91, 92) are **GRANTED** in part and **DENIED** in part. In addition,

since they are no longer defendants in this case, Nancy Peeler and Robert Scott's motions to dismiss (Dkts. 93, 95) are **DENIED** as moot.

As with *Walters*, here, plaintiffs' bodily integrity claims against defendants Governor Snyder, the City of Flint (*Monell*), Dillon, Wurfel, Busch, Cook, Prysby, Rosenthal, Earley, Ambrose, Glasgow, Johnson, and Croft can proceed; their professional negligence claims against defendants LAN, Rowe, and Veolia can proceed; and plaintiffs may continue to request punitive damages with respect to their remaining § 1983 claims. However, in all other respects, plaintiffs' claims are dismissed.

IT IS SO ORDERED.

Dated: August 2, 2019        s/Judith E. Levy
      Ann Arbor, Michigan     JUDITH E. LEVY
                             United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 2, 2019.

                                 s/Shawna Burns
                                 SHAWNA BURNS
                                 Case Manager